UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC., | ) ) ) | FILED |
| | ) | JUNE 2, 2008          YM |
| Plaintiff, | ) ) | 08CV3161 |
| | ) | JUDGE MORAN |
| v. | ) ) | MAGISTRATE JUDGE KEYS |
| RENEE L. MASSEY | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT FOR BREACH OF GUARANTY

Plaintiff, HSBC Mortgage Services Warehouse Lending, Inc. ("Plaintiff" or "Lender"), by its attorneys, Loeb & Loeb LLP, hereby complains of defendant Renee L. Massey ("Defendant" or "Massey") as follows:

## NATURE OF THE ACTION

1.      This is a straightforward action stemming from Defendant's failure to honor a written guaranty. Plaintiff made loans to Defendant's company, Home Loans USA, Inc. ("HLI"). Defendant, who is a principal of HLI, personally guaranteed payment to Lender for these loans. HLI defaulted on its obligations to Lender by failing to repay the loans in full as and when due. Accordingly, pursuant to the "Guaranty Agreements" (as defined and described below), Defendant is obligated to pay Lender for the full amount that HLI now owes. However, to date, Defendant has failed to make any payment to Lender.

## PARTIES

2.      Plaintiff Lender is a Delaware corporation and conducts business at 26525 North Riverwoods Boulevard, Mettawa, Illinois.

3.     Defendant is a citizen of the State of California and who conducts business at 7536 East Chapman Avenue, Orange, California.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1) as complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.  In addition, pursuant to the terms of the Guaranty Agreements, Defendant has submitted to venue in this judicial district.

## FACTS

6.     Defendant is a principal of HLI.  At all times relevant to this dispute, HLI was located in Orange, California, and was engaged in purchasing, originating and servicing mortgage loans.

7.     Lender made loans (the "Loans") to HLI pursuant to that certain Credit Agreement dated December 8, 2003 (the "2003 Agreement").  The 2003 Agreement was amended by that certain Amended and Restated Credit Agreement dated June 30, 2006 (the "Credit Agreement").  A true and correct copy of the Credit Agreement is attached hereto as Exhibit A and incorporated herein by reference.

8.     To secure HLI's obligations and liabilities to Lender under the 2003 Agreement and the Credit Agreement, Defendant absolutely, unconditionally and irrevocably guarantied to Lender the full and prompt payment of the Loans and all other obligations and liabilities of HLI to Lender pursuant to that certain Continuing Guaranty dated December 8, 2003 and that certain Consent and Reaffirmation dated June 30, 2006 (collectively, the "Guaranty Agreements").

True and correct copies of the Guaranty Agreements are attached hereto as <u>Exhibit B</u> and incorporated herein by reference.

<u>COUNT I - BREACH OF GUARANTY</u>

9.      For this paragraph 9, Lender realleges and incorporates by reference herein the allegations of paragraphs 1-8 of this Complaint as if fully set forth herein.

10.      Pursuant to letters dated April 5, 2007 and May 16, 2007 (the "Default Letters"), Lender notified HLI and Defendant of defaults by HLI under the Credit Agreement.  True and correct copies of the Default Letters are attached hereto as <u>Exhibit C</u> and incorporated herein by reference.

11.      HLI is indebted to Lender in the amount of $433,386.73 as of August 20, 2007 for principal, accrued interest and fees, and additional amounts are due and owing to Lender for the accrual of interest at the default rate and for other costs, fees and expenses, including without limitation, attorneys' fees and expenses.  The same amounts are due and owing by Defendant to Lender under the Guaranty Agreements.

12.      Pursuant to letter dated August 20, 2007, Lender demanded that Defendant satisfy the obligations and liabilities to Lender under the Guaranty Agreements (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as <u>Exhibit D</u> and incorporated herein by reference.

13.      Defendant has failed to pay her obligations and liabilities to Lender under the Guaranty Agreements.

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    enter a judgment in favor of Lender and against Massey in the amount of $433,386.73 together with accrued interest, costs, fees and expenses including attorneys' fees and expenses under the Guaranty Agreements; and

B.    grant Lender such other relief as this Court deems just and appropriate under the circumstances.

Dated: June 2, 2008

Respectfully submitted,

HSBC MORTGAGE SERVICES
WAREHOUSE LENDING, INC.

By:    /s/ Stanley F. Orszula
            One of Its Attorneys

Michael L. Molinaro (ARDC #6183321)
Stanley F. Orszula (ARDC #6257162)
LOEB & LOEB LLP
321 North Clark Street, Suite 2300
Chicago, Illinois 60610
Telephone: (312) 464-3100
Facsimile: (312) 464-3111
mmolinaro@loeb.com
sorszula@loeb.com

08CV3161
JUDGE MORAN   YM
MAGISTRATE JUDGE KEYS

# EXHIBIT A

APR-03-2007  10:33AM  FROM-                                    T-150  P.002    F-730

AMENDED AND RESTATED

CREDIT AGREEMENT

by and between

HOME LOANS USA, INC.

and

HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC.

Dated as of June 30, 2006

APR-09-2007  10:33AM  FROM-                                      T-150  P.003  F-730

# TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS; INTERPRETATION........................................................ 1

Section 1.1.    Definitions................................................................................ 1
Section 1.2.    Interpretation........................................................................... 10

SECTION 2.  THE CREDIT .............................................................................. 10

Section 2.1.    The Revolving Credit................................................................. 10
Section 2.2.    Applicable Interest Rates ......................................................... 11
Section 2.3.    Minimum Borrowing Amounts .................................................. 11
Section 2.4.    Borrowing Procedures .............................................................. 11
Section 2.5.    Prepayments ............................................................................ 12
Section 2.6.    Noteless Agreement; Evidence of Indebtedness......................... 13
Section 2.7.    Commitment Terminations ........................................................ 14

SECTION 3.  FEES AND PAYMENTS ................................................................ 14

Section 3.1.    Loan Related Fees .................................................................... 14
Section 3.2.    Audit Fees ............................................................................... 15
Section 3.3.    Place and Application of Payments ............................................ 15

SECTION 4.  THE COLLATERAL AND GUARANTY ............................................. 15

Section 4.1.    The Collateral........................................................................... 15
Section 4.2.    Further Assurances................................................................... 16
Section 4.3.    Guaranty.................................................................................. 16

SECTION 5.  REPRESENTATIONS AND WARRANTIES....................................... 16

Section 5.1.    Organization and Qualification .................................................. 16
Section 5.2.    Subsidiaries............................................................................. 16
Section 5.3.    Corporate Authority and Validity of Obligations ......................... 17
Section 5.4.    Use of Proceeds........................................................................ 17
Section 5.5.    Financial Reports ..................................................................... 17
Section 5.6.    No Material Adverse Change...................................................... 17
Section 5.7.    Full Disclosure ........................................................................ 17
Section 5.8.    Good Title ............................................................................... 18
Section 5.9.    Investment Company ............................................................... 18
Section 5.10.   Litigation and Other Controversies............................................ 18
Section 5.11.   Taxes ..................................................................................... 18
Section 5.12.   Approvals................................................................................ 18
Section 5.13.   Affiliate Transactions............................................................... 18
Section 5.14.   ERISA...................................................................................... 18
Section 5.15.   Compliance with Laws ............................................................. 19
Section 5.16.   Other Agreements .................................................................... 19
Section 5.17.   No Defaults ............................................................................. 19

SECTION 6.  CONDITIONS PRECEDENT .................................................. 19
    Section 6.1.  Initial Loan ........................................................................ 19
    Section 6.2.  All Loans ........................................................................... 20

SECTION 7.  COVENANTS .................................................................... 21
    Section 7.1.   Maintenance of Business ................................................. 21
    Section 7.2.   Maintenance of Property ................................................. 21
    Section 7.3.   Taxes and Assessments ................................................... 21
    Section 7.4.   Insurance ........................................................................ 21
    Section 7.5.   Financial Reports ........................................................... 21
    Section 7.6.   Indebtedness for Borrowed Money .................................. 23
    Section 7.7.   Liens .............................................................................. 23
    Section 7.8.   Mergers, Consolidations and Sales .................................. 24
    Section 7.9.   ERISA ............................................................................ 24
    Section 7.10.  Compliance with Laws .................................................... 24
    Section 7.11.  Burdensome Contracts with Affiliates ............................... 25
    Section 7.12.  Maintenance of Subsidiaries ............................................ 25
    Section 7.13.  Change in the Nature of Business ..................................... 25
    Section 7.14.  Tangible Net Worth ........................................................ 25
    Section 7.15.  Leverage Ratio ............................................................... 25
    Section 7.16.  Net Income .................................................................... 25
    Section 7.17.  Dividends and Certain Other Restricted Payments .............. 25

SECTION 8.  EVENTS OF DEFAULT AND REMEDIES ............................... 25
    Section 8.1.  Events of Default .............................................................. 25
    Section 8.2.  Remedies - Certain Events of Default ................................. 27
    Section 8.3.  Remedies - Other Events of Default .................................... 27
    Section 8.4.  Expenses ......................................................................... 28

SECTION 9.  MISCELLANEOUS ............................................................. 28
    Section 9.1.   No Waiver of Rights ....................................................... 28
    Section 9.2.   Non-Business Day ........................................................... 28
    Section 9.3.   Documentary Taxes ........................................................ 28
    Section 9.4.   Survival of Representations .............................................. 28
    Section 9.5.   Survival of Indemnities ................................................... 28
    Section 9.6.   Notices ........................................................................... 28
    Section 9.7.   Counterparts ................................................................... 29
    Section 9.8.   Successors and Assigns .................................................... 29
    Section 9.9.   Amendments ................................................................... 29
    Section 9.10.  Fees and Indemnification ................................................ 30
    Section 9.11.  Assignments ................................................................... 30
    Section 9.12.  Governing Law ............................................................... 30
    Section 9.13.  Headings ........................................................................ 31
    Section 9.14.  Entire Agreement ........................................................... 31
    Section 9.15.  Terms of Collateral Documents Not Superseded ................. 31
    Section 9.16.  Construction ................................................................... 31

ii

145024661V-1

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | — | Revolving Credit Note |
| Exhibit B | — | States In Which Borrower Qualified to do Business |
| Exhibit C | — | Required Documents |
| Exhibit C-1 | — | Funding Request Form |
| Exhibit C-2 | — | Closing Agent Approval Package |
| Exhibit D | — | Subsidiaries |
| Exhibit E | — | Borrowing Base Certificate |
| Exhibit F | — | Compliance Certificate |
| Exhibit G | — | Pending Litigation |
| Exhibit H | — | Missing Collateral Fees |
| Exhibit I | — | Aged Loan Processing Fees |

APR-03-2007 10:33AM FROM-                                    T-150 P.006/037 F-730

## AMENDED AND RESTATED
## CREDIT AGREEMENT

THIS AMENDED AND RESTATED CREDIT AGREEMENT (this "Agreement") dated as of this 30th day of June, 2006 by and between HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC., a Delaware corporation with its corporate office at 3023 HSBC Way, Suite 400, Fort Mill, South Carolina 29715 (said HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC. together with any of its Affiliates and their successors and assigns being hereinafter referred to as the "Lender") and HOME LOANS USA, INC. a California corporation (the "Borrower").

### RECITALS

WHEREAS, the Lender currently provides the Borrower with a secured revolving warehouse line of credit pursuant to the terms of that certain Credit Agreement dated as of December 8, 2003, as amended from time to time and as assigned to Lender by Household Commercial Financial Services, Inc. (the "Original Lender") (such Credit Agreement as so amended and assigned being hereinafter referred to as the "Original Credit Agreement"); and

WHEREAS, the Borrower has requested and the Lender has agreed to increase the amount of credit available under the Original Credit Agreement and make certain other amendments thereto and for the sake of convenience and clarity, to amend and restate the Original Credit Agreement in its entirety.

NOW THEREFORE, in consideration of the premises and of the covenants and agreements hereinafter contained, the parties hereto agree to amend and restate the Original Credit Agreement in its entirety to read as follows:

SECTION 1.  DEFINITIONS; INTERPRETATION

Section 1.1.  Definitions.  The following terms when used herein have the following meanings:

"Affiliate" means any Person, directly or indirectly controlling or controlled by, or under direct or indirect common control with, another Person. A Person shall be deemed to control another Person for the purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise.

"Applicable Advance Rate" means, initially, 100% as such percentage may from time to time be reduced by the Lender in its sole discretion upon verbal notice to the Borrower, it being acknowledged and agreed that the initial Applicable Advance Rate has been determined by the Lender, in part based upon current returns for sales of mortgaged loans in the secondary market and in the event the Lender determines in its sole discretion that there has been an adverse change in such market it intends to reduce the Applicable Advance Rate hereunder.

1

"Applicable File Fee" means, at any time, the amount specified as the File Fee which is applicable at the time a Loan is funded as set forth in the Pricing Schedule and shall apply to all Mortgage Loans securing such Loan.

"Applicable Margin" means with respect to any Loan as of the day when funded by the Lender, the percentage rate per annum which is applicable at such time as set forth in the Pricing Schedule.

"Applicable Percentage" means, at any time, the percentage specified as the Applicable Third Party Sales Percentage as set forth on the Pricing Schedule.

"Applicable Rate Index" means with respect to any Loan as of the day when funded by the Lender, the Rate Index which is applicable at such time as set forth in the Pricing Schedule.

"Applicable Third Party Sales Percentage" means as of any date of determination thereof, the percentage in effect based on the Borrower's Status as determined in accordance with the Pricing Schedule.

"Base Status" is defined in the Pricing Schedule.

"Borrowing Base" means, as of any time it is to be determined the lesser of (a) the Applicable Advance Rate times the then outstanding unpaid principal amount of Eligible Mortgage Loans or (b) market value (as determined by the Lender in its sole discretion) of Eligible Mortgage Loans.

"Bronze Status" is defined in the Pricing Schedule.

"Business Day" means any day other than a Saturday or Sunday on which banks are not authorized or required to close in Chicago, Illinois or Charlotte, North Carolina.

"Capital Lease" means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee.

"Capitalized Lease Obligation" means the amount of the liability shown on the balance sheet of any Person in respect of a Capital Lease as determined in accordance with GAAP.

"Closing Agent" means any title company or other Person, in each case, approved in writing by the Lender.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"Collateral" means all properties, rights, interests and privileges from time to time subject to the Liens granted to the Lender pursuant to the Collateral Documents.

"Collateral Documents" means the Security Agreement and all other security agreements, financing statements and other documents as shall from time to time secure the Obligations.

APR-03-2007  10:34AM  FROM-                                T-150  P.008/037  F-730

"Commitment" is defined in Section 2.1 hereof.

"Controlled Group" means all members of a controlled group of corporations and all trades and businesses (whether or not incorporated) under common control which, together with the Borrower or any of its Subsidiaries, are treated as a single employer under Section 414 of the Code.

"Default" means any event or condition, the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"Domestic Rate" means for any day the rate per annum then most recently announced by JPMorgan Chase Bank, N.A., a national banking association, as its corporate base rate at Chicago, Illinois (or if such rate is not being quoted, the rate which is the successor to such rate, and if no successor is being quoted, the rate conceptually equivalent to such rate which the domestic commercial bank having the highest combined capital and surplus of any bank having its principal office in Chicago, Illinois is quoting). The Domestic Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. JPMorgan Chase Bank, N.A. and the Lender may make commercial loans or other loans at rates of interest at, above or below the Domestic Rate.

"Electronic Agent" means MERSCORP, INC., a Delaware corporation.

"Eligible Mortgage Loan" shall mean any Mortgage Loan that is a MERS Designated Mortgage Loan having all of the following characteristics:

(i)    is the legal, valid and binding obligation of the maker thereof in full force and effect and is enforceable in accordance with its terms;

(ii)    is either a first or second Mortgage Loan which comports in all respects with General Underwriting Guidelines, subject to any exceptions or additional programs or products which HSBC-MS, in its sole and absolute discretion has made available to Borrower, it being understood and agreed that nothing herein contained shall be construed as creating any obligation on Lender to make such exceptions, programs or products available to Borrower, whether or not Lender has made the same available to other borrowers with similar credit facilities from Lender;

(iii)    was made or acquired by the Borrower in the ordinary course of the Borrower's business in accordance with the General Underwriting Guidelines, was in an original principal amount of not less than $10,000 and not more than $625,000 ($925,000 in the case of a Mortgage Loan secured by Property located in the States of California, Connecticut and Massachusetts), such Mortgage Loan was fully funded (except in the case of a HELOC Loan) and the Borrower holds good and indefeasible sole title to such Mortgage Loan subject to no claims, liens, charges or other rights of any other Person except, in the case of a MERS Designated Mortgage Loan, as provided in the MERS Agreement;

(iv)    no payment under such Mortgage Loan is more than thirty (30) days past the due date set forth in the underlying promissory note and mortgage (or deed of trust);

3

(v)    the Lender has a perfected Lien and security interest in such Mortgage Loan free and clear of any Liens or claims of any other Person;

(vi)    such Mortgage Loan has not been included in the Borrowing Base for more than forty-five (45) days;

(vii)    such Mortgage Loan contains the entire agreement of the parties thereto with respect to the subject matter thereof and is not a Rewritten Mortgage Loan;

(viii)    such Mortgage Loan is secured by a valid and subsisting first or second, as the case may be, mortgage lien of record on the Property covered by the related mortgage or deed of trust subject only to (1) the Lien of current real property taxes and assessments not yet due and payable; (2) covenants, conditions and restrictions, rights of way, easements and other matters of the public records, as of the date of recording, being acceptable to mortgage lending institutions generally and specifically referred to in a lender's title insurance policy delivered to the originator of said Mortgage Loan and (i) referred to or otherwise considered in the appraisal made for the originator of said Mortgage Loan or (ii) which do not materially adversely affect the appraised value of the Property as set forth in such appraisal; (3) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by said Mortgage Loan or the use, enjoyment, value or marketability of the related Property; or (4) in the case of a second Mortgage Loan, a Permitted First Mortgage Lien;

(ix)    subject to paragraph (iv) above, such Mortgage Loan is free of any default of any party thereto (including the Borrower), offsets, defenses or counterclaims to such Mortgage Loan, including the obligation of the related obligor to pay the unpaid principal and interest on the underlying promissory note and free from any rescission, cancellation or avoidance whether by operation of law or otherwise;

(x)    a lender's title insurance policy, issued in standard American Land Title Association form, or such other form satisfactory to the Lender by, or procured by, the applicable Closing Agent, in favor of the Borrower and such Borrower's successors and assigns (or the original lender and such lender's successors and assigns) in an amount at least equal to the original principal amount of such Mortgage Loan insuring the mortgagee's interest under the related Mortgage Loan as the holder of a valid first or second mortgage lien of record on the related Property subject only to exceptions described in clause (viii) above, was effective on the date of the origination or acquisition, as the case may be, of such Mortgage Loan, and, such policy will be valid and thereafter such policy shall continue in full force and effect provided however, that such title insurance shall not be required for second mortgage loans under $100,000;

(xi)    the Property subject to such Mortgage Loan is Property which is zoned and suitable for residential purposes;

(xii)    there is no proceeding pending or threatened for the total or partial condemnation of the Property subject to such Mortgage Loan, nor is such a proceeding

4

145024601V-1

APR-03-2007  10:35AM   FROM-                                          T-150  P.010/037  F-730

currently occurring, and each Property is undamaged by waste, fire, earthquake, earth movement or other casualty;

(xiii)  no improvements on adjoining property encroach upon the Property subject to such Mortgage Loan, except as are stated in the title insurance policy and affirmatively insured and such Property constitutes a legally subdivided parcel separate from any real property not covered by the mortgage or deed of trust securing such Mortgage Loan;

(xiv)  with respect to each Mortgage Loan secured by a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such deed of trust, and no fees or expenses are or will become payable by the owners to the trustee under the deed of trust, except in connection with a trustee's sale after default by the related mortgagor;

(xv)  the mortgage (or deed of trust) securing such Mortgage Loan contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the related Property of the benefits of the security, including (A) in the case of a deed of trust, by trustee's sale and (B) otherwise by judicial foreclosure and the Borrower is duly licensed to conduct business, or is exempt from such licensing, and is in good standing in the state in which the related Property is located. There is no homestead or other exemption available which could materially interfere with the right to sell the related Property at a trustee's sale or the right to foreclose the related mortgage;

(xvi)  an appraisal satisfying the General Underwriting Guidelines was performed with respect to each Mortgage Loan;

(xvii)  the Borrower has no knowledge that there exist on the Property subject to such Mortgage Loan any hazardous materials, regulated substances, hazardous substances, hazardous wastes or solid wastes, as such terms are defined in the Comprehensive Environmental Response Compensation and Liability Act, the Resource Conservation and Recovery Act of 1976, or other federal, state or local environmental legislation;

(xviii)  such Mortgage Loan shall not be due from an Affiliate, subsidiary, officer or employee of any Borrower, from the United States or any agency or department thereof, or from any foreign debtor or borrower;

(xix)  such Mortgage Loan is and shall be evidenced by only one original mortgage note;

(xx)  each mortgage (or deed of trust) or an assignment thereof relating to such Mortgage Loan shall identify MERS as nominee for the Borrower, as the mortgagee;

(xxi)  the Required Documents for said Mortgage Loan were delivered to the Lender within three (3) Business Days of disbursement of the related Loan proceeds;

5

(xxii)  except in case of a HELOC Loan, said Mortgage Loan was or previously had been closed or fully disbursed and recorded on the date first included in the Borrowing Base;

(xxiii)  said Mortgage Loan was originated, closed and funded in compliance with all applicable laws, rules and regulations, including, without limitation, those referenced in Section 5.15 hereof,

(xxiv)  Lender shall have received such evidence and documentation as it shall require to verify that the matters set forth in clauses (i) through (xxiii) above are true and correct.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"Event of Default" means any event or condition specified in Section 8.1 hereof.

"Funding Package" shall mean, with respect to any Mortgage Loan, those items designated as such on Exhibit C hereto.

"GAAP" means generally acceptable accounting principles as in effect from time to time, applied by the Borrower and its Subsidiaries as a basis consistent with the preparation of the Borrower's most recent financial statements furnished to the Lender pursuant to Section 5.5 hereof.

"General Underwriting Guidelines" shall mean the HSBC-MS general underwriting guidelines as in effect from time to time that apply generally to the sale of mortgage loans to HSBC-MS, as set forth from time to time on the Lender's website at www.hsbcmortgageb2b.com, the Borrower acknowledging and agreeing that it shall be Borrower's responsibility to periodically check such website and keep itself informed as to changes from time to time in the General Underwriting Guidelines.

"Gold Status" is defined in the Pricing Schedule.

"Guaranty" means a guaranty agreement satisfactory to the Lender from the Guarantor, as the same may from time to time be amended, together with any guaranties issued in substitution or replacement therefor.

"Guarantor" means Renee L. Massey.

"HELOC Loan" means a "home equity" line of credit secured by a first or second priority mortgage on a single family residence.

"HSBC-MS" means, collectively, HSBC Mortgage Services Inc., a Delaware corporation, and each of its Affiliates.

6

APR-03-2007 10:36AM FROM-                                T-150  P.012/037  F-730

"HSBC-MS Agreements" means any and all agreements from time to time entered into by the Borrower with HSBC-MS in connection with the sale by the Borrower of Mortgage Loans to HSBC-MS.

"HSBC-MS Mortgage Loan Volume" is defined in the Pricing Schedule.

"Indebtedness for Borrowed Money" means for any Person (without duplication) (i) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (ii) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business), (iii) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or becomes liable for the payment of such indebtedness, (iv) all Capitalized Lease Obligations of such Person and (v) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money.

"Intercreditor Agreement" means an intercreditor agreement satisfactory to the Lender among Lender, Borrower and Borrower's other lenders, as the same may be amended or modified from time to time.

"LIBOR" means the British Bankers' Association Interest Settlement Rate for one month deposits in U.S. dollars appearing on Reuters Screen FRBD as of 11:00 a.m. (London time) on any date of determination provided that (i) if Reuters Screen FRBD is not available to the Lender for any reason, the applicable LIBOR for the relevant Loan shall instead be the applicable British Bankers Association Interest Settlement Rate for one month deposits in U.S. dollars as reported by any other generally recognized financial information service as of 11:00 a.m. (London time) on the date of determination and (ii) if no such British Bankers' Association Interest Settlement Rate is available to the Lender, the applicable LIBOR shall be the rate determined by the Lender as its one month LIBOR, in each case as in effect from time to time.

"Lien" means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, capital lease or other title retention arrangement.

"Loans" is defined in Section 2.1 hereof.

"Loan Documents" means this Agreement, the Guaranty, the MERS Agreement, the Collateral Documents, the Intercreditor Agreement and the HSBC-MS Agreements and if requested pursuant to Section 2.6, the Note.

"Material Plan" is defined in Section 8.1(h) hereof.

"MERS" means Mortgage Electronic Registration Systems, Inc., a Delaware corporation.

"MERS Agreement" means Electronic Tracking Agreement satisfactory to the Lender among the Lender, the Electronic Agent, MERS and the Borrower as the same may from time to time be amended.

7

HS0246RV-1

08CV3161
JUDGE MORAN    YM
MAGISTRATE JUDGE KEYS

APR-03-2007 10:36AM  FROM-                                    T-150  P.013/037  F-730

"MERS Designated Mortgage Loan" is defined in the MERS Agreement.

"Mortgage Loan" shall mean a loan secured by residential real estate including without limitation: (i) a promissory note and related mortgage (or deed of trust) and any other security documents, (ii) all reserves, guaranties and insurance policies, including without limitation, all mortgage and title insurance policies and rights of the owner of such loan to retain all or any part of such reserves or to return premiums or payments with respect thereto and (iii) all right, title and interest of the owner of such Mortgage Loan in the Property covered by said mortgage (or deed of trust).

"Net Income" means, with reference to any period, the net income (or net loss) of the Borrower and its Subsidiaries for such period as computed on a consolidated basis in accordance with GAAP.

"Note" is defined in Section 2.6 hereof.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all other obligations of the Borrower to the Lender arising under the Loan Documents, and all other obligations of the Borrower to HSBC-MS under or in connection with any HSBC-MS Agreement, including without limitation, any and all repurchase obligations in connection therewith, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

"PBGC" means the Pension Benefit Guaranty Corporation or any Person succeeding to any or all of its functions under ERISA.

"Permitted First Mortgage Lien" means any first mortgage lien permitted under General Underwriting Guidelines.

"Person" means an individual, partnership, corporation, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

"Plan" means any employee pension benefit plan which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained by a member of the Controlled Group for employees of a member of the Controlled Group, (ii) is maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which a member of the Controlled Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions, or (iii) under which a member of the Controlled Group has any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years or by reason of being deemed a contributing sponsor under Section 4064 of ERISA.

"Platinum Status" is defined in the Pricing Schedule.

"Pricing Schedule" means the Schedule attached hereto identified as Schedule I.

8

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Remittance Account" means that certain account number 001842846 maintained with HSBC USA in the name of the Lender under the sole control of the Lender as well as any other account from time to time designated by the Lender to be the "remittance account" for purposes of this Agreement and the other Loan Documents regardless of whether or not Lender has notified Borrower of such designation.

"Required Documents" means, with respect to any Mortgage Loan, those instruments and documents identified as such on Exhibit C hereto.

"Revolving Credit" is defined in Section 2.1 hereof.

"Rewritten Mortgage Loan" means any Mortgage Loan in respect of which (i) the original terms have been rewritten, restructured or otherwise modified or (ii) forbearance has been granted; provided, however, that a Rewritten Mortgage Loan shall not include a Mortgage Loan as to which the Borrower has permitted an assumption or granted a partial release in accordance with its prior practices and consistent with General Underwriting Guidelines.

"Security Agreement" means that certain Security Agreement dated as of December 8, 2003 between the Borrower and the Lender, as the same may from time to time be amended.

"Settlement Date" is defined in Section 2.5 hereof.

"Settlement Period" is defined in Section 2.5 hereof.

"Silver Status" is defined in the Pricing Schedule.

"Status" is defined in the Pricing Schedule.

"Streamlined Program Eligible" means any time other than when the Base Status is in effect pursuant to the Pricing Schedule.

"Subsidiary" means any corporation or other entity of which more than fifty percent (50%) of the outstanding voting stock or comparable equity interests (including interests as a limited partner in a limited partnership) is at the time directly or indirectly owned by the Borrower, by one or more of its Subsidiaries, or by the Borrower and one or more of its Subsidiaries.

"Tangible Net Worth" means, as of any time the same is to be determined, the total shareholders' equity (including capital stock, additional paid-in-capital and retained earnings after deducting treasury stock, but excluding minority interest in Subsidiaries) which would appear on the balance sheet of the Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP minus the sum of (i) all assets which would be classified as intangible assets under GAAP, including, without limitation, goodwill, patents, trademarks, tradenames, copyrights, franchises and deferred assets and charges (including, without limitation, deferred tax assets, unamortized debt discount and expense, organization costs and

9

deferred research and development expense) and similar assets, (ii) the write-up of assets above cost, (iii) the value of any servicing contract not determined in accordance with SFAS No. 65, Accounting for Certain Mortgage Banking Activities and SFAS No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities or subsequent revisions thereof, (iv) all assets due from or owing by an Affiliate, officer, director or shareholder of the Borrower and (v) other assets as may be specified by the Lender to Borrower from time to time.

"Termination Date" shall mean July 31, 2007 or such earlier date on which the Commitment is terminated in whole pursuant to Sections 2.7, 8.2 or 8.3 hereof.

"Total Liabilities" means, as of any time the same is to be determined, the aggregate of all indebtedness, obligations, liabilities, reserves and any other items which would be listed as a liability on a balance sheet of the Borrower and its Subsidiaries determined on a consolidated basis in accordance with GAAP.

"Total Mortgage Loan Volume" is defined in the Pricing Schedule.

"Unfunded Vested Liabilities" means, with respect to any Plan at any time, the amount (if any) by which the present value of all vested nonforfeitable accrued benefits under such Plan exceeds the fair market value of all Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the Controlled Group to the PBGC or the Plan under Title IV of ERISA.

"Welfare Plan" means a "welfare plan," as defined in Section 3(1) of ERISA.

"Wholly-Owned" means a Subsidiary of which all of the issued and outstanding shares of stock (other than directors' qualifying shares as required by law) or other comparable equity interests shall be owned by the Borrower and/or one or more of its Wholly-Owned Subsidiaries.

Section 1.2.    Interpretation. The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined. All references to times of day herein are references to Central Standard Time unless otherwise specifically provided. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, the same shall be done in accordance with GAAP except where such principles are inconsistent with the specific provisions of this Agreement.

SECTION 2.    THE CREDIT

Section 2.1.    The Revolving Credit. (a) Loans. Subject to the terms and conditions hereof, the Lender agrees to extend a revolving credit (the "Revolving Credit") to the Borrower in an aggregate principal amount at any one time outstanding not to exceed the lesser of (i) $5,000,000 (subject to any reductions or increases thereof pursuant to the terms hereof) (the "Commitment") or (ii) the Borrowing Base as then determined and computed, which may be availed of by the Borrower in its discretion from time to time, be repaid and used again, to and including the Termination Date. The Revolving Credit will be available to the Borrower in the

10

16592466V-1

form of Loans (the "Loans"), it being understood and agreed that the aggregate outstanding principal amount of Loans shall not at any time exceed the Commitment (subject to reductions as aforesaid).

(b)  Maturity.  All Loans and all other unpaid Obligations shall mature and be payable in full by the Borrower on the Termination Date.

(c)  Discretionary Increase in Commitment.  The Lender may, in its sole discretion, increase the Commitment from time to time and such increase shall be recorded by the Lender on its books and records and such record shall be prima facie evidence of the amount of the Commitment as in effect from time to time.

Section 2.2.  Applicable Interest Rates. (a)  Pre-Default Rate.  Each Loan made by the Lender shall bear interest (computed on the basis of a year of 365 or 366 days as the case may be for actual days elapsed) on the unpaid principal amount thereof from the date such Loan is made until maturity (whether by acceleration or otherwise) at a rate per annum determined by adding the Applicable Margin to the Applicable Rate Index as in effect on the date such Loan is funded, provided that, any change in the interest rate comprising such Applicable Rate Index, i.e., the Domestic Rate or LIBOR (as the case may be), shall be effective as of the date of such change, payable on the dates provided in Section 2.5 hereof and at maturity (whether by acceleration or otherwise).

(b)  Default Rate.  If any payment (including any required prepayment) of principal on any Loan is not made when due (whether by acceleration, pursuant to Section 2.5(b) as a result of Lender's determination that any Mortgage Loan is no longer an Eligible Mortgage Loan since such Mortgage Loan was originally included in the Borrowing Base, or otherwise), such Loan shall bear interest (computed on the basis of a year of 365 or 366 as the case may be for actual days elapsed) from the date such payment was due until paid in full, payable on demand, at a rate per annum equal to the sum of the interest rate otherwise applicable thereto plus 2%.

Section 2.3.  Minimum Borrowing Amounts.  Each Loan shall be in an amount not less than $10,000.

Section 2.4.  Borrowing Procedures. (a)  Notice to the Lender.  Subject to Section 2.1(b) hereof, the Borrower shall give telecopy or other written notice to the Lender (which notice shall be irrevocable once given) by no later than 5:00 p.m. (Central Standard Time) for fundings to Closing Agents, one Business Day prior to the date of any requested Loan, other than a requested Loan the proceeds of which will be used by the Borrower to fund a purchase transaction through a Closing Agent in which case such notice shall be given to Lender by 10:30 a.m. (Central Standard Time) on the date of the requested Loan.  Each such notice shall (i) specify the date of the requested Loan (which shall be a Business Day) and the amount of the requested Loan and (ii) be accompanied by a complete Funding Package for the Eligible Mortgage Loan(s) supporting such Loan.  The Borrower agrees that the Lender may rely on any such notice given by any person the Lender in good faith believes is authorized to request Loans on behalf of the Borrower without the necessity of independent investigation and, in any event, such notice shall govern if the Lender has acted in reliance thereon.

11

(b)    Disbursement of Loans. Subject to Sections 6 and 2.1(b) hereof, the Lender shall make the proceeds of each Loan available to the Borrower by crediting the same to the Remittance Account not later than the close of business on the date of such borrowing and, Borrower hereby directs Lender , unless the Lender in its sole discretion agrees otherwise, to wire transfer such proceeds directly to the Closing Agent. The Lender and the Borrower acknowledge and agree that Lender may from time to time make deposits from its own funds ("Additional Borrower Deposits") into the Remittance Account which shall be held, subject to the security interest in favor of the Lender therein pursuant to the Security Agreement, for the account of the Borrower and the Lender agrees that it will, so long as no Default or Event of Default shall have occurred and be continuing, in connection with any wire transfer of Loan proceeds to a Closing Agent also include in such wire transfer an amount of Additional Borrower Deposits as Borrower shall designate to cover costs and fees owing by Borrower in connection with the funding or purchase of the related Mortgage Loans. The Borrower acknowledges that the Remittance Account is a non-interest bearing account and accordingly, it shall not be entitled to any interest or other additional amounts on account of Additional Borrower Deposits.

Section 2.5.    Prepayments. (a) Voluntary. The Borrower may prepay on any Business Day without premium or penalty and in whole or in part (but, if in part, then in an amount not less than $10,000) any Loans at any time on one Business Day's prior notice to the Lender by no later than 5:00 p.m. (Central Standard Time), such prepayment to be made by the payment of the principal amount to be prepaid together with accrued interest thereon and any expenses owing in connection therewith.

(b)    Mandatory.

(i)    Concurrently with each reduction or termination of the Commitment (whether voluntarily pursuant to Section 2.7 or otherwise) the Borrower shall prepay the Loans by the amount, if any, necessary so that the aggregate outstanding principal balance of the Loans shall not exceed the Commitment as so reduced, each such prepayment to be made by the payment of the principal amount to be prepaid plus accrued interest thereon and any expenses owing in connection therewith.

(ii)    The Borrower covenants and agrees that in the event that the aggregate outstanding principal amount of the Loans shall at any time and for any reason exceed the Borrowing Base as then determined and computed, the Borrower shall immediately without notice or demand pay over the amount of the excess to the Lender as and for a mandatory prepayment on the Loans plus accrued interest, fees and expenses owing with respect to the amount so prepaid.

(iii)    With respect to Mortgage Loans which are either included or identified for inclusion in the Borrowing Base or with respect to which the Lender has made a Loan, Borrower shall cause (x) all proceeds (including without limitation all amounts payable with respect to principal, interest and premium) from sales of Mortgage Loans, (y) any payment on any Mortgage Loan which exceeds 2% of the original principal amount of such Mortgage Loan and (z) five (5) Business Days from and after written request by the Lender to do so, all Collateral Payments (as defined in the Security Agreement) in respect of the Mortgage Loans to be deposited directly into the Remittance Account. From time

12

145026681V-1

to time on such dates as the Lender shall determine but no less frequently than on the 5th and 20th of each month (each such date, a "Settlement Date"), all amounts on deposit in the Remittance Account shall, so long as no Default or Event of Default shall have occurred and be continuing, be applied as follows:

    (aa)  first to the payment of all fees (other than Section 3.1(e) hereof), expenses and interest owing in respect of the Loan(s) made hereunder in reliance on the Mortgage Loan(s) sold during the period commencing the immediately preceding Settlement Date and ending on the Business Day immediately preceding the relevant Settlement Date or in the case of the first Settlement Date occurring after the date hereof, the period commencing the date hereof and ending on the Business Day immediately preceding such Settlement Date (a "Settlement Period");

    (bb)  second, to any other Obligations owing hereunder;

    (cc)  third, to the payment of all principal owing in respect of the Loans made hereunder in reliance on the Mortgage Loan(s) sold during the relevant Settlement Period;

    (dd)  fourth, to the payment of all amounts owing to Lender under Section 3.1(e) hereof; and

    (ee)  fifth, to the Borrower or to whomever the Lender determines to be lawfully entitled thereto.

    (c)  Reborrowings. Any amount paid or prepaid on the Loans on or before the Termination Date may, subject to the terms and conditions of this Agreement, be borrowed, repaid and borrowed again.

    Section 2.6.  Noteless Agreement; Evidence of Indebtedness. (i) The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from each Loan made by the Lender hereunder from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder and the amount of any payments applied to the Loans.

    (ii)  The entries maintained in the account maintained pursuant to paragraph (i) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded; provided, however, that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Obligations in accordance with their terms.

    (iii)  The Lender may at any time request that the Loans be evidenced by a promissory note representing its Loans substantially in the form of Exhibit A (the "Note"). In such event, the Borrower shall execute and deliver to the Lender such Note payable to the order of the Lender. Thereafter, the Loans evidenced by the Note and interest thereon shall at all times (prior to any assignment pursuant hereto) be represented by such Note payable to the order of the

Lender, except to the extent that the Lender subsequently returns any such Note for cancellation and requests that the Loans once again be evidenced as described in paragraph (i) above.

Section 2.7.  Commitment Terminations. (a) Borrower. The Borrower shall have the right at any time and from time to time, upon three (3) Business Days' prior written notice to the Lender to terminate without premium or penalty, in whole but not in part, the Commitment. Any termination of the Commitment pursuant to this Section 2.7 may not be reinstated and concurrently with any such termination, the Borrower shall pay to the Lender all outstanding Obligations owing to Lender.

(b)  Lender. The Lender shall have the right in its sole discretion at any time after July 31, 2006 upon thirty (30) days' prior written notice to Borrower, to terminate the Commitment in whole but not in part. Concurrently with any such termination, the Borrower shall pay to the Lender all outstanding Obligations owing to Lender. The Lender's right of termination contained in this Section 2.7(b) shall be in addition to its rights under Sections 8.2 and 8.3 hereof.

# SECTION 3.  FEES AND PAYMENTS

Section 3.1.  Loan Related Fees.

(a) The Borrower shall pay to the Lender wire transfer fees in an amount equal to $15.00 per wire transfer together with such processing fees and other charges as the Lender from time to time customarily imposes in connection with the disbursement and administration of Loans hereunder, such fees to be paid in accordance with Section 2.5 hereof.

(b) The Borrower shall also pay to the Lender a file fee in the amount of the Applicable File Fee for each Mortgage Loan pledged to secure each Loan made hereunder, such fee to be due and payable on the earlier of (i) the Settlement Date following either the date such Mortgage Loan is purchased by a third party or the date the Loan made against such Mortgage Loan is otherwise repaid, as the case may be or (ii) the Termination Date.

(c) Without waiving any other right Lender may have hereunder, whether under Sections 2.2(b), 2.5(b), 8.2 or 8.3 or otherwise, Borrower shall also pay Lender the fees set forth on Exhibit H attached hereto in the event Lender shall have not received a complete Funding Package and all Required Documents for any Mortgage Loan supporting a Loan made hereunder within seven (7) days of disbursement of such Loan, such fees to be due and payable on the earlier of (i) the Settlement Date following either the date such Mortgage Loan is purchased by a third party or the date the Loan made against such Mortgage Loan is otherwise repaid, as the case may be, or (ii) the Termination Date.

(d) Without waiving any other right Lender may have hereunder, whether under Sections 2.2(b), 2.5(b), 8.2 or 8.3 or otherwise, Borrower shall also pay Lender the fees set forth on Exhibit I hereto in the event a Loan has been outstanding for more than sixty (60) days since the Mortgage Loan supporting such Loan was originally included in the Borrowing Base, such fees to be due and payable on the earlier of (i) the Settlement Date following either the date such Mortgage Loan is purchased by a third party or the date the Loan made against such Mortgage Loan is otherwise repaid, as the case may be or (ii) the Termination Date.

14

1450246RV-1

(c) The Borrower shall also pay to Lender a monthly third party sales fee for each month in which (i) the difference between (x) Total Mortgage Loan Volume for each month less (y) HSBC-MS Mortgage Loan Volume for such month exceeds (ii) the Applicable Percentage of Total Mortgage Loan Volume, such fee to be in an amount equal to one-half of one percent (.5%) of the amount specified in clause (i) and to be payable on the earlier of (aa) the Settlement Date(s) following determination that such fee is owing to Lender or (bb) the Termination Date.

Section 3.2.  *Audit Fees*.  The Borrower shall pay to the Lender the Lender's costs and expenses in connection with audits of the Collateral performed by the Lender or its agents or representatives; provided, however, that in the absence of any Default or Event of Default, the Borrower shall not be required to reimburse the Lender for more than two (2) such audit(s) per calendar year.

Section 3.3.  *Place and Application of Payments*.  All payments of principal and interest on the Loans and all payments of fees and all other amounts payable under this Agreement shall be made by wire transfer or other immediately available funds at the place of payment to the Lender by no later than 1:00 p.m. (Central Standard Time) at the principal office of the Lender in Chicago, Illinois (or such other location as the Lender may designate to the Borrower). Any payments received after such time shall be deemed to have been received by the Lender on the next Business Day. All such payments shall be made in lawful money of the United States of America, in immediately available funds at the place of payment, without setoff or counterclaim.

Anything contained herein to the contrary notwithstanding, all payments and collections received in respect of the Obligations and all proceeds of Collateral received, in each instance, by the Lender after the occurrence of an Event of Default shall be applied as follows:

(a) first to the payment of any outstanding costs and expenses incurred by the Lender in monitoring, verifying, protecting, preserving or enforcing any liens on the Collateral or in protecting, preserving or enforcing rights hereunder or under any other Loan Document, and in any event including all costs and expenses of a character which the Borrower has agreed to pay under Section 9.10 hereof;

(b) second to the payment of any outstanding interest or other fees or amounts due hereunder or under any other Loan Document other than for principal;

(c) third to the payment of principal owing on the Loans and other Obligations; and

(d) fourth to the Borrower or whomever the Lender determines may be lawfully entitled thereto.

## SECTION 4.  THE COLLATERAL AND GUARANTY

Section 4.1.  *The Collateral*.  The Loans and the other Obligations of the Borrower hereunder and under the other Loan Documents shall be secured by valid and perfected first priority Liens pursuant to the Security Agreement in favor of the Lender on all of the Borrower's now existing and hereafter arising or acquired Mortgage Loans which are included, or identified for inclusion, in the Borrowing Base or which are transferred to the custody and control of the Lender and all accounts, general intangibles, instruments, documents, records and other rights

15

145024668V-1

and properties related to such Mortgage Loans (as more fully described in the Security Agreement) together with all proceeds relating thereto.

Section 4.2.  Further Assurances.  The Borrower covenants and agrees that it will comply with all terms and conditions of each of the Collateral Documents and that it will, at any time, and from time to time as requested by the Lender, execute and deliver such further instruments and agreements and do such acts and things as the Lender may deem necessary or appropriate to provide for or protect or perfect the lien of the Lender in the Collateral.

Section 4.3.  Guaranty.  The Obligations and all other indebtedness of Borrower to the Lender shall at all times be guarantied by the Guarantor pursuant to the Guaranty.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender as follows:

Section 5.1.  Organization and Qualification.  The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of California, has full and adequate corporate power to own its Property and to carry on its business as now conducted, and is duly licensed or qualified and in good standing in each jurisdiction in which the nature of its business conducted by it or the nature of the Property owned or leased by it makes such licensing or qualification necessary, including without limitation, the states listed on Exhibit B hereto except as otherwise disclosed in writing to the Lender and except for those jurisdictions in which the failure to so qualify would not have a material adverse effect on the operations of the Borrower or any of its Subsidiaries unless such failure would affect the ability of the Borrower to enforce payment of any part of the Collateral. Exhibit B contains a listing of all states in which the Borrower is duly qualified and licensed to do business, or exempt from such qualification and/or licensing, as of the date hereof.

Section 5.2.  Subsidiaries.  Each Subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was incorporated or organized, as the case may be, has full and adequate power to own its Property and carry on its business as conducted, and is duly licensed or qualified and in good standing in each jurisdiction in which the nature of its business as now conducted or proposed to be conducted by it or the nature of the Property owned or leased by it makes such licensing or qualification necessary except for those jurisdictions in which the failure to so qualify would not have a material adverse effect on the operations of the Borrower or its Subsidiaries taken as a whole unless such failure would affect the ability of the Borrower to enforce payment of any part of the Collateral. Exhibit D hereto identifies each Subsidiary, the jurisdiction of its incorporation or organization, as the case may be, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by the Borrower and the Subsidiaries and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class of its authorized capital stock and other equity interests and the number of shares of each class issued and outstanding.  All of the issued and outstanding shares of capital stock and other equity interests of each Subsidiary are validly issued and outstanding and fully paid and nonassessable and all such shares and other equity interests indicated on Exhibit D as owned by the Borrower or a Subsidiary are owned, beneficially and of record, by the Borrower or such Subsidiary, free

16

APR-03-2007 10:40AM FROM-                              T-150  P.022/037  F-730

and clear of all Liens. There are no outstanding commitments or other obligations of any Subsidiary to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Subsidiary.

Section 5.3.  Corporate Authority and Validity of Obligations. The Borrower has full right and authority to enter into the Loan Documents to make the borrowings herein provided for, to grant to the Lender the Liens described in the Collateral Documents, to issue its Note if requested pursuant to Section 2.6 hereof and to perform all of its obligations hereunder and under the other Loan Documents. The Loan Documents have been duly authorized, executed and delivered by the Borrower and constitute valid and binding obligations of the Borrower enforceable in accordance with their terms, subject to bankruptcy laws and general principles of equity, and the Loan Documents do not, nor does the performance or observance by the Borrower of any of the matters or things herein or therein provided for, contravene any provision of law or any judgment, injunction, order or decree binding upon the Borrower or any Subsidiary or any charter or by-law provision of the Borrower or any Subsidiary or any covenant, indenture or agreement of or affecting the Borrower or any Subsidiary or any of their respective Properties, or result in the creation or imposition of any Lien on any Property of the Borrower or any Subsidiary except pursuant to the Loan Documents.

Section 5.4.  Use of Proceeds. The Loans hereunder shall be used by the Borrower solely for the purchase or funding by it of Eligible Mortgage Loans.

Section 5.5.  Financial Reports. The balance sheet of the Borrower as at December 31, 2005 and the related consolidated statements of income, retained earnings and cash flows of the Borrower for the fiscal year then ended and accompanying notes thereto, which financial statements are accompanied by the report of Stafford & Warren, LLP, independent public accountants, and the unaudited balance sheet of the Borrower and its Subsidiaries as at April 30, 2006, and the related consolidated statements of income, retained earnings and cash flows of the Borrower and its Subsidiaries for the four (4) months then ended, heretofore furnished to the Lender, fairly present the financial condition of the Borrower and its Subsidiaries as at such dates and the results of its operations and cash flows for the periods then ended in conformity with generally accepted accounting principles applied on a consistent basis; provided that the unaudited financial statements remain subject to normal year end adjustments.

Section 5.6.  No Material Adverse Change. Since December 31, 2005, there has been no change in the condition, financial or otherwise, of the Borrower or any Subsidiary, except changes in the ordinary course of business, none of which individually or in the aggregate have been materially adverse.

Section 5.7.  Full Disclosure. The statements and information furnished to the Lender in connection with the negotiation of this Agreement and the commitment by the Lender to provide the financing contemplated hereby do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained therein or herein not misleading, the Lender acknowledging that as to any projections furnished to the Lender, the Borrower does not warrant their accuracy, but only represents that the same were prepared on the basis of information and estimates the Borrower believed to be reasonable at the time such projections were prepared.

17

14502496RV-1

APR-03-2007 10:40AM FROM- T-150  P.023/037  F-730

Section 5.8.  Good Title.  The Borrower and its Subsidiaries have good and defensible title to their respective assets as reflected on the most recent balance sheets of the Borrower and its Subsidiaries furnished to the Lender (except for sales of assets by the Borrower and its Subsidiaries in the ordinary course of their respective businesses), subject to no Liens other than such thereof as are permitted by Section 7.7 hereof.

Section 5.9.  Investment Company.  Neither the Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 5.10.  Litigation and Other Controversies.  Except as set forth on Exhibit G, there is no litigation or governmental proceeding or labor controversy pending, nor to the knowledge of the Borrower threatened, against the Borrower or any Subsidiary which either (a) involves a claim for $10,000 or more or (b) if adversely determined would (i) impair the validity or enforceability of, or impair the ability of the Borrower to perform its obligations under this Agreement or any other Loan Document or (ii) result in any material adverse change in the financial condition or Property, business or operations of the Borrower or any Subsidiary or (iii) have an adverse affect on the Collateral.

Section 5.11.  Taxes.  All tax returns required to be filed by the Borrower or any Subsidiary in any jurisdiction have, in fact, been filed, and all taxes, assessments, fees and other governmental charges upon the Borrower or any Subsidiary or upon any of their respective Properties, income or franchises, which are shown to be due and payable in such returns have been paid except as otherwise disclosed in writing to the Lender and except where such taxes are being contested in good faith and appropriate reserves have been established therefor. The Borrower does not know of any proposed additional tax assessment against it or any Subsidiary for which adequate provision in accordance with GAAP has not been made on its accounts except as otherwise disclosed in writing to the Lender. Adequate provisions in accordance with GAAP for taxes on the books of the Borrower and each Subsidiary have been made for all open years, and for its current fiscal period.

Section 5.12.  Approvals.  No authorization, consent, license, exemption, filing (except for the filing of financing statements as herein contemplated) or registration with any court or governmental department, agency or instrumentality, nor any approval or consent of the stockholders of the Borrower or any other Person, is or will be necessary to the valid execution, delivery or performance by the Borrower of this Agreement or any other Loan Document.

Section 5.13.  Affiliate Transactions.  Neither the Borrower nor any Subsidiary is a party to any contracts or agreements with any of its Affiliates (other than with Wholly-Owned Subsidiaries) on terms and conditions which are less favorable to the Borrower or such Subsidiary than would be usual and customary in similar contracts or agreements between Persons not affiliated with each other.

Section 5.14.  ERISA.  The Borrower and each Subsidiary are in compliance in all material respects with ERISA to the extent applicable to them and have received no notice to the contrary from the PBGC or any other governmental entity or agency. As of December 31, 2005 the Borrower and its Subsidiaries would have had no liability to PBGC in respect of Unfunded

18

1450266MV-1

Vested Liabilities if all employee pension benefit plans maintained by the Borrower and its Subsidiaries had been terminated as of such date. No condition exists or event or transaction has occurred with respect to any Plan which could reasonably be expected to result in the incurrence by the Borrower or any Subsidiary of any material liability, fine or penalty under ERISA or the Code or in connection with any Plan. Neither the Borrower nor any Subsidiary has any contingent liability with respect to any post-retirement benefits under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA and liability for post-retirement medical and life insurance benefits.

Section 5.15. Compliance with Laws. The Borrower and its Subsidiaries are in compliance in all material respects with the requirements of all federal, state and local laws, rules and regulations applicable to or pertaining to the Properties or business operations of the Borrower or any Subsidiary (including, without limitation, Title VIII of the Civil Rights Act of 1968 (commonly referred to as the "Fair Housing Act") and its state and local analogues, Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the local and state analogues to the foregoing federal states (commonly referred to as "predatory lending prohibitions" or "fair lending requirements"), the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, the Federal Reserve Board's Regulations "B" and "Z", the Soldiers' and Sailors' Civil Relief Act of 1940, and any other federal, state and local laws relating to interest, usury, consumer credit, equal credit opportunity, fair credit reporting, privacy, consumer protection, false or deceptive trade practices and disclosure, the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes or substances), non-compliance with which could have a material adverse effect on either (a) the financial condition, Properties, business or operations of the Borrower or any Subsidiary or (b) the Collateral. Neither the Borrower nor any Subsidiary has received notice to the effect that its operations are not in compliance with any of the requirements of applicable federal, state or local environmental, health and safety statutes and regulations or are the subject of any governmental investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, which non-compliance or remedial action could have a material adverse effect on the financial condition, Properties, business or operations of the Borrower or any Subsidiary.

Section 5.16. Other Agreements. Neither the Borrower nor any Subsidiary is in default under the terms of any covenant, indenture or agreement of or affecting the Borrower or any Subsidiary or any of their Properties.

Section 5.17. No Defaults. No Default or Event of Default has occurred and is continuing.

## SECTION 6. CONDITIONS PRECEDENT

The obligation of the Lender to make any Loan or any other financial accommodation hereunder shall be subject to the following conditions precedent:

Section 6.1. Initial Loan. Prior to the making of the initial Loan hereunder:

19

14303466;V-1

(a) The Lender shall have received (i) certified copies of resolutions of the Board of Directors of the Borrower, authorizing the execution and delivery of this Agreement and the other Loan Documents, indicating the authorized signers of this Agreement and the other Loan Documents and all other documents relating thereto, the persons authorized to request Loans hereunder and the specimen signatures of such signers, and (ii) copies of certificates of good standing certified by the appropriate governmental officer in the jurisdiction of the Borrower's incorporation and, upon request by the Lender therefor, in each state in which it is authorized to do business as a foreign corporation;

(b) The Lender shall have received this Agreement, if requested pursuant to Section 2.6 hereof, the Note, the Guaranty, the MERS Agreement, the Intercreditor Agreement and the other Loan Documents, together with any financing statements and amendments to existing financing statements requested by the Lender in connection therewith;

(c) The Lender shall have received copies (executed or certified, as may be appropriate) of all legal documents or proceedings taken in connection with the execution and delivery of this Agreement and the other Loan Documents;

(d) The Lender shall have received certified copies of the Borrower's articles of incorporation and by-laws and all amendments thereto through the date hereof.

(e) The Lender shall have received evidence or assurances satisfactory to it of the accuracy of the representations contained in Section 5.15 hereof.

Section 6.2.　　All Loans.　As of the time of the making of each Loan (including the initial Borrowing):

(a) The Lender shall have received the notice and copies of the documents required by Section 2.4 hereof.

(b) Each of the representations and warranties of the Borrower set forth in Section 5 hereof shall be true and correct as of said time, except to the extent that any such representation or warranty relates solely to an earlier date;

(c) The Borrower shall be in full compliance with all of the terms and conditions of this Agreement and of the other Loan Documents, and no Default or Event of Default shall have occurred and be continuing or would occur as a result of making such Borrowing;

(d) After giving effect to any Loan, the aggregate principal amount of all Loans hereunder shall not exceed the lesser of (i) the Borrowing Base and (ii) the Commitment; and

(e) Such Loan shall not violate any order, judgment or decree of any court or other authority or any provision of law or regulation applicable to the Lender.

Each request for a Loan hereunder shall be deemed to be a representation and warranty by the Borrower on the date of such Borrowing as to the facts specified in clauses (b) through (d) of this Section 6.2.

APR-03-2007 10:41AM  FROM-     .                        T-190  P.026/037  F-730

08CV3161

JUDGE MORAN   YM

SECTION 7.  COVENANTS          MAGISTRATE JUDGE KEYS

The Borrower agrees that, so long as any Commitment is available to or any Obligations are outstanding hereunder, except to the extent compliance in any case or cases is waived in writing by the Lender:

Section 7.1.  Maintenance of Business.  The Borrower shall, and shall cause each Subsidiary to, preserve and keep in force and effect its corporate existence and all licenses, permits and franchises necessary to the proper conduct of its business.

Section 7.2.  Maintenance of Property.  The Borrower will maintain, preserve and keep its Properties in good repair, working order and condition (ordinary wear and tear excepted) and will from time to time make all needful and proper repairs, renewals, replacements, additions and betterments thereto so that at all times the efficiency thereof shall be fully preserved and maintained, and will cause each Subsidiary to do so in respect of Property owned or used by it.

Section 7.3.  Taxes and Assessments.  The Borrower will duly pay and discharge, and will cause each Subsidiary to duly pay and discharge, all taxes, rates, assessments, fees and governmental charges upon or against it or its Properties, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.

Section 7.4.  Insurance.  The Borrower will insure and keep insured, and will cause each Subsidiary to insure and keep insured, with good and responsible insurance companies, all insurable Property owned by it which is of a character usually insured by Persons similarly situated and operating like Properties against loss or damage from such hazards and risks, and in such amounts, as are insured by Persons similarly situated and operating like Properties; and the Borrower will insure, and cause each Subsidiary to insure, such other hazards and risks (including employers' and public liability risks) with good and responsible insurance companies as and to the extent usually insured by Persons similarly situated and conducting similar businesses. The Borrower shall in any event maintain insurance on the Collateral to the extent required by the Collateral Documents. The Borrower will upon request of the Lender furnish a certificate setting forth in summary form the nature and extent of the insurance maintained pursuant to this Section.

Section 7.5.  Financial Reports.  The Borrower will maintain a standard and modern system of accounting in accordance with GAAP and will furnish, or cause to be furnished, to the Lender and its duly authorized representatives such information (including financial statements and copies of tax returns) respecting the business and financial condition of the Borrower, the Guarantor and the Subsidiaries as the Lender may reasonably request; and without any request, will furnish to the Lender:

(a) as soon as available, and in any event within thirty (30) days after the end of each calendar month, a borrowing base certificate in the form attached hereto as Exhibit E showing the computation of the Borrowing Base in reasonable detail as of the close of such monthly period, certified to by the chief financial officer of the Borrower;

21

1492046#V-1

(b) as soon as available, and in any event within thirty (30) days after the end of each calendar month, a copy of the consolidated and consolidating balance sheet and consolidated and consolidating statements of income, retained earnings and cash flows of the Borrower and its Subsidiaries for such period, all in reasonable detail showing in comparative form the figures for the corresponding date and period in the previous fiscal year, prepared by the Borrower in accordance with GAAP, together with a report on the aging of Mortgage Loans included or identified for inclusion in the Borrowing Base or with respect to which the Lender has made a Loan and a report of charge-offs, recoveries and repossession of collateral with respect to such Mortgage Loans, all in reasonable detail prepared by the Borrower, and in each case certified to by the chief financial officer of the Borrower;

(c) as soon as available, and in any event within ninety (90) days after the close of each fiscal year of the Borrower, a copy of the consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as of the close of such fiscal year and the consolidated and consolidating statements of income, retained earnings and cash flows of the Borrower and its Subsidiaries for such period, and accompanying notes thereto, all in reasonable detail showing in comparative form the figures for the previous fiscal year, accompanied by an unqualified opinion thereon of Stafford & Warren, LLP or another firm of independent public accountants of recognized standing, selected by the Borrower and satisfactory to the Lender, to the effect that the financial statements have been prepared in accordance with GAAP and present fairly in accordance with GAAP the consolidated and consolidating financial condition of the Borrower and its Subsidiaries as of the close of such fiscal year and the results of their operations and cash flows for the fiscal year then ended and that an examination of such accounts in connection with such financial statements has been made in accordance with generally accepted auditing standards and, accordingly, such examination included such tests of the accounting records and such other auditing procedures as were considered necessary in the circumstances;

(d) not later than thirty (30) days after the end of each fiscal quarter of the Borrower (or at more frequent intervals as the Lender may designate) an activity report satisfactory to the Lender on all of the Borrower's warehouse line credit facilities;

(e) not later than thirty (30) business days after receipt by the Borrower thereof, a copy of any management letters on internal accounting controls of the Borrower or any Subsidiary prepared by its independent public accountants;

(f) not later than thirty (30) business days after receipt by the Borrower thereof, a copy of any internal audit reports (with responses, when available) with respect to the Borrower or any Subsidiary prepared by its controller's office or other in-house staff accountants;

(g) not later than thirty (30) business days after receipt by the Borrower thereof, a copy of each audit made by any regulatory agency of the books and records of the Borrower or any of its Subsidiaries;

(h) promptly after knowledge thereof shall have come to the attention of any responsible officer of the Borrower, written notice of (i) any threatened or pending litigation or governmental proceeding or labor controversy against the Borrower, the Guarantor or any Subsidiary which involves an amount of $10,000 or more or which, if adversely determined, would have a material

14382466/V-1

adverse effect on the financial condition, Properties, business or operations of the Borrower and its Subsidiaries, taken as a whole, or of the occurrence of any Default or Event of Default hereunder and (ii) any material dispute or claim relating to any Mortgage Loan identified for inclusion in the Borrowing Base or with respect to which the Lender has made a Loan; and

(i) not later than April 30th of each year, current personal financial statements of the Guarantor in detail satisfactory to the Lender and a copy of the tax returns filed by the Guarantor for the immediately preceding year.

Each of the financial statements furnished to the Lender pursuant to clauses (b) and (c) of this Section shall be accompanied by a written compliance certificate in the form attached hereto as Exhibit F signed by the chief financial officer of the Borrower to the effect that to the best of the chief financial officer's knowledge and belief no Default or Event of Default has occurred during the period covered by such statements or, if any such Default or Event of Default has occurred during such period, setting forth a description of such Default or Event of Default and specifying the action, if any, taken by the Borrower to remedy the same. Such certificate shall also set forth the calculations supporting such statements in respect of Sections 7.14, 7.15 and 7.16 of this Agreement

Section 7.6.   Indebtedness for Borrowed Money.  The Borrower will not, nor will it permit any Subsidiary to, issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money; provided, however, that the foregoing provisions shall not restrict nor operate to prevent:

(a) the indebtedness of the Borrower owing to the Lender hereunder;

(b) the indebtedness of the Borrower to other lenders not exceeding $10,000,000 in aggregate principal amount from time to time incurred to fund the purchase, origination and holding by the Borrower or any of its Subsidiaries of mortgage loans which are pledged to and in the possession of such lenders (or an agent or bailee acting on their behalf) to secure repayment of such indebtedness; and

(c) purchase money indebtedness and capitalized lease obligations secured by liens permitted by Section 7.7(f) hereof in an aggregate amount not to exceed $450,000 at any one time outstanding.

Section 7.7.   Liens.  The Borrower will not, nor will it permit any Subsidiary to, create, incur or permit to exist any Lien of any kind on any Property owned by the Borrower or any Subsidiary; provided, however, that this Section shall not apply to nor operate to prevent:

(a) Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges, good faith cash deposits in connection with tenders, contracts or leases to which the Borrower or any Subsidiary is a party or other cash deposits required to be made in the ordinary course of business, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

23

(b) mechanics', workmen's, materialmen's, landlords', carriers', or other similar Liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest;

(c) the pledge of assets for the purpose of securing an appeal, stay or discharge in the course of any legal proceeding, provided that the aggregate amount of liabilities of the Borrower and its Subsidiaries secured by a pledge of assets permitted under this clause, including interest and penalties thereon, if any, shall not be in excess of $10,000 any one time outstanding;

(d) the Liens granted in favor of the Lender by the Collateral Documents and Liens provided for in the MERS Agreement,

(e) Liens on mortgage loans and related assets securing indebtedness permitted by Section 7.6(b) hereof; and

(f) Liens on property of the Borrower or any of its Subsidiaries created solely for the purpose of securing indebtedness permitted by Section 7.6(c) hereof incurred to finance the purchase price of Property, provided that no such Lien shall extend to or cover other Property of the Borrower or such Subsidiary other than the respective Property so acquired, and the original principal amount of the indebtedness secured by any such Lien shall not exceed the original purchase price of such Property.

Section 7.8.   Mergers, Consolidations and Sales.   The Borrower will not, nor will it permit any Subsidiary to, be a party to any merger or consolidation, or sell, transfer, lease or otherwise dispose of all or any substantial part of its Property, or in any event sell or discount (with or without recourse) any of its notes or accounts receivable (other than sales of Mortgage Loans not constituting Collateral in the ordinary course of business and sales of Collateral permitted under the Security Agreement). The sale, lease, transfer or other disposition of 5% of the assets of the Borrower or any Subsidiary shall be deemed substantial for the foregoing purposes.

Section 7.9.   ERISA.   The Borrower will, and will cause each Subsidiary to, promptly pay and discharge all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed might result in the imposition of a Lien against any of its Properties. The Borrower will, and will cause each Subsidiary to, promptly notify the Lender of (i) the occurrence of any reportable event (as defined in ERISA) with respect to a Plan, (ii) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor, (iii) its intention to terminate or withdraw from any Plan, and (iv) the occurrence of any event with respect to any Plan which would result in the incurrence by the Borrower or any Subsidiary of any material liability, fine or penalty, or any material increase in the contingent liability of the Borrower or any Subsidiary with respect to any post-retirement Welfare Plan benefit.

Section 7.10.   Compliance with Laws.   The Borrower will, and will cause each Subsidiary to, comply in all material respects with the requirements of all federal, state and local laws, rules, regulations, ordinances and orders applicable to or pertaining to the Collateral,

24

1450246\V-1

Properties or business operations of the Borrower or any Subsidiary, including, without limitation, all of such referenced in Section 5.15 hereof, non-compliance with which could have a material adverse effect on the financial condition, Properties, business or operations of the Borrower or any Subsidiary or could result in a Lien upon any of their Property. The Borrower agrees, at intervals reasonably acceptable to the Lender, to make periodic inspections of the documentation relating to mortgage loans made or acquired by it to monitor compliance of the same with applicable law and to provide the Lender with the results of such inspections.

Section 7.11. <u>Burdensome Contracts with Affiliates</u>. The Borrower will not, nor will it permit any Subsidiary to, enter into any contract, agreement or business arrangement with any of its Affiliates (other than with Wholly-Owned Subsidiaries) on terms and conditions which are less favorable to the Borrower or such Subsidiary than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other.

Section 7.12. <u>Maintenance of Subsidiaries</u>. The Borrower will not assign, sell or transfer, or permit any Subsidiary to issue, assign, sell or transfer, any Voting Stock of a Subsidiary, provided that the foregoing shall not operate to prevent the issuance, sale and transfer to any person of any voting stock of a Subsidiary solely for the purpose of qualifying, and to the extent legally necessary to qualify, such person as a director of such Subsidiary.

Section 7.13. <u>Change in the Nature of Business</u>. The Borrower will not, and will not permit any Subsidiary to, engage in any business or activity if as a result the general nature of the business of the Borrower or any Subsidiary would be changed in any material respect from the general nature of the business engaged in by the Borrower or any Subsidiary on the date of this Agreement.

Section 7.14. <u>Tangible Net Worth</u>. The Borrower shall at all times maintain Tangible Net Worth at not less than $600,000.

Section 7.15. <u>Leverage Ratio</u>. The Borrower shall not at any time have a ratio of Total Liabilities to Tangible Net Worth (the "Leverage Ratio") of more than 12.0 to 1.0

Section 7.16. <u>Net Income</u>. The Borrower shall as of the last day of each month, have positive Net Income for the three month period ending such date.

Section 7.17. <u>Dividends and Certain Other Restricted Payments</u>. The Borrower will not during any fiscal year (a) declare or pay any dividends on or make any other distributions in respect of any class or series of its capital stock (other than dividends payable solely in its capital stock) or (b) directly or indirectly purchase, redeem or otherwise acquire or retire any of its capital stock provided however, that if and so long as no Default or Event of Default has occurred and is continuing or would occur as a result thereof (including, without limitation, compliance and proforma compliance with Sections 7.14 through 7.16 hereof, the Borrower may pay dividends to its shareholders.

# SECTION 8. <u>EVENTS OF DEFAULT AND REMEDIES</u>

Section 8.1. <u>Events of Default</u>. Any one or more of the following shall constitute an Event of Default hereunder:

(a) default in the payment when due of all or any part of the principal of or interest on any Loan (whether at the stated maturity thereof or at any other time provided for in this Agreement) or of any fee or other amount payable by the Borrower hereunder or by the Borrower under any other Loan Document; or

(b) default in the observance or performance of any covenant set forth in Sections 7.5, 7.8, 7.9 or 7.13 or 7.14 through 7.17 hereof; or

(c) default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within thirty (30) days after the earlier to occur of (i) the date on which such failure shall first become known to any officer of the Borrower or (ii) the date on which written notice thereof is given to the Borrower by the Lender; or

(d) any representation or warranty made by the Borrower herein or by the Borrower or the Guarantor or in any other Loan Document, or in any statement or certificate furnished by it pursuant hereto or thereto, or in connection with any Loan made hereunder, proves untrue in any material respect as of the date of the issuance or making thereof; or

(e) any event occurs or condition exists (other than those described in clauses (a) through (d) above) which is specified as an Event of Default under any Loan Document, or any Loan Document shall for any reason not be or shall cease to be in full force and effect (other than pursuant to Section 2.7 hereof), or any Loan Document is declared to be null and void or the Guarantor shall attempt to terminate or contest in any manner the validity binding nature or enforceability of any Loan Document, or the MERS Agreement shall be terminated for any reason; or

(f) either (i) default shall occur under any evidence of Indebtedness for Borrowed Money issued, assumed or guaranteed by the Borrower or the Guarantor or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated) or any such Indebtedness for Borrowed Money shall not be paid when due (whether by lapse of time, acceleration or otherwise)or (ii) Borrower or the Guarantor shall fail to pay or perform when due any repurchase obligation or any other obligation owing by it to HSBC-MS or any of Lender's other Affiliates; or

(g) any judgment or judgments, writ or writs, or warrant or warrants of attachment, or any similar process or processes in an aggregate amount in excess of $10,000 shall be entered or filed against the Borrower or any of its Subsidiaries or the Guarantor or against any of their Property, and in each case which remains unvacated, unbonded, unstayed or unsatisfied for a period of thirty (30) days; or

(h) 100% of the issued and outstanding share of capital stock of the Borrower having the power to vote for the election of directors of the Borrower ceases at any time and for any reason (including death or incapacity) to be owned, legally and beneficially, by Renee L. Massey; or

(i) Renee L. Massey shall at any time and for any reason (including death or incapacity) cease to be actively involved in the day-to-day management of the Borrower; or

26

1450245R8V-1

(j) the Borrower or any member of its Controlled Group shall fail to pay when due an amount or amounts aggregating in excess $1,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; or notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of $25,000 (collectively, a "Material Plan") shall be filed under Title IV of ERISA by the Borrower or any other member of its Controlled Group, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against the Borrower or any member of its Controlled Group to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within thirty (30) days thereafter; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated; or

(k) the Borrower, the Guarantor or any Subsidiary shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to, or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, or (vi) fail to contest in good faith any appointment or proceeding described in Section 8.1(l) hereof; or

(l) a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for the Borrower or any Subsidiary or any substantial part of any of their Property, or a proceeding described in Section 8.1(k)(v) shall be instituted against the Borrower, the Guarantor or any Subsidiary and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of thirty (30) days.

Section 8.2.  Remedies - Certain Events of Default.  When any Event of Default described in clauses (a) through (j), both inclusive, of Section 8.1 has occurred and is continuing, the Lender may take either or both of the following actions:

(a) terminate the obligation of the Lender to extend any further credit hereunder on the date (which may be the date thereof) stated in such notice;

(b) declare the principal of and the accrued interest on the Loans and other Obligations to be forthwith due and payable and thereupon the Loans and the other Obligations, including both principal and interest and all fees, charges and other amounts payable hereunder and under the other Loan Documents, shall be and become immediately due and payable without further demand, presentment, protest or notice of any kind.

Section 8.3.  Remedies - Other Events of Default.  When any Event of Default described in clauses (k) or (l) of Section 8.1 has occurred and is continuing, then the Loans and

27

14500248MV-1

all other Obligations, including both principal and interest, and all fees, charges and other amounts payable hereunder and under the other Loan Documents, shall immediately become due and payable without presentment, demand, protest or notice of any kind, and the obligations of the Lender to extend further credit pursuant to any of the terms hereof shall immediately terminate.

Section 8.4.  Expenses.  The Borrower agrees to pay to the Lender, or any other holder of the Obligations, all costs and expenses incurred or paid by the Lender or any such holder, including reasonable attorneys' fees and court costs, in connection with any Default or Event of Default by the Borrower hereunder or in connection with the enforcement of any of the terms hereof or of the other Loan Documents.

# SECTION 9.  MISCELLANEOUS.

Section 9.1.  No Waiver of Rights.  No delay or failure on the part of the Lender or on the part of the holder or holders of the Obligations in the exercise of any power or right shall operate as a waiver thereof, nor as an acquiescence in any default, nor shall any single or partial exercise thereof preclude any other or further exercise of any other power or right, and the rights and remedies hereunder of the Lender and of the holder or holders of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

Section 9.2.  Non-Business Day.  If any payment of principal or interest on any Loan or of any fee hereunder shall fall due on a day which is not a Business Day, interest at the rate such principal bears for the period prior to maturity or at the rate such fee accrues shall continue to accrue from the stated due date thereof to and including the next succeeding Business Day, on which the same shall be payable.  If any Settlement Date shall fall on a day which is not a Business Day, such Settlement Date shall be extended to the next succeeding Business Day.

Section 9.3.  Documentary Taxes.  The Borrower agrees that it will pay any documentary, stamp or similar taxes payable in respect to this Agreement, the Loans or any other Loan Document, including interest and penalties, in the event any such taxes are assessed irrespective of when such assessment is made and whether or not any credit is then in use or available hereunder.

Section 9.4.  Survival of Representations.  All representations and warranties made herein or in certificates given pursuant hereto shall survive the execution and delivery of this Agreement and of the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

Section 9.5.  Survival of Indemnities.  All Indemnities with respect to the Loans shall survive the termination of this Agreement and the payment of the Loans and the other Obligations.

Section 9.6.  Notices.  Except as otherwise specified herein, all notices hereunder shall be in writing (including cable, telecopy or telex) and shall be given to the relevant party at its address or telecopier number set forth below or such other address, telecopier number or telex

1452246/V-1

number as such party may hereafter specify by notice to the other, given by a recognized overnight courier service, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt. Notices hereunder shall be addressed to:

If to the Borrower:

Home Loans USA, Inc.
7536 East Chapman Avenue
Orange, California 92869
Attention:      Renee L. Massey
Telephone:     (714) 538-4601
Telecopy:      (714) 538-7416

If to the Lender:

HSBC MORTGAGE SERVICES
    WAREHOUSE LENDING, INC.
3023 HSBC Way, Suite 400
Fort Mill, South Carolina 29715
Attention:      Jane Axton
Telephone:     (803) 835-6102
Telecopy:      (800) 547-8696

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, five (5) days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section; provided that any notice given pursuant to Section 2 hereof shall be effective only upon receipt.

Section 9.7.    Counterparts.    This Agreement may be executed in any number of counterparts, and by the different parties on different counterparts, each of which when executed shall be deemed an original but all such counterparts taken together shall constitute one and the same instrument.

Section 9.8.    Successors and Assigns.    This Agreement shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Lender and its successors and assigns, including any subsequent holder of the Obligations; provided, however, that the Borrower may not assign any of its rights or obligations hereunder without the written consent of the Lender.

Section 9.9.    Amendments.    Any provision of this Agreement or the other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Borrower and the Lender.

29

148034661\V-1

Section 9.10.  Fees and Indemnification. (a) The Borrower agrees to pay the reasonable fees and disbursements of counsel to the Lender, in connection with the preparation and execution of this Agreement and the other Loan Documents, and any recording or filing of any of the foregoing, and any amendment, waiver or consent related hereto, whether or not the transactions contemplated herein are consummated, The Borrower further agrees to pay the Lender or any other holder of the Obligations all costs and expenses (including court costs and attorneys' fees) incurred or paid by the Lender or any other holder of the Obligations in connection with any Default or Event of Default or in connection with the enforcement of this Agreement or any other Loan Document or any other instrument or document delivered thereunder.

The Borrower further agrees to indemnify the Lender, its directors, officers and employees against all losses, claims, damages, penalties, judgments, liabilities and expenses (including, without limitations, all reasonable expenses of litigation or preparation therefor whether or not the Lender is a party thereto) which any of them may pay or incur arising out of or relating to this Agreement, any other Loan Document, the Collateral (including without limitation any environmental claims or liabilities related to any property subject to a Mortgage Loan) the transactions contemplated hereby or thereby or the direct or indirect application or proposed application of the proceeds of any Loan hereunder, other than those which arise from the gross negligence or willful misconduct of the party claiming indemnification. The obligations of the Borrower under this Section shall survive the termination of this Agreement.

Section 9.11.  Assignments. The Lender may, with the prior written consent of the Borrower (which consent shall not be unreasonably withheld or delayed and, in any event, shall not be required for an assignment by Lender to one of its Affiliates) at any time assign and delegate to another financial institution or other Person (any Person to which such an assignment and delegation is to be made being herein called "Assignee") all of the Lender's Loans and Commitment provided that the Borrower shall be entitled to continue to deal solely and directly with the Lender in connection with the interests so assigned until the date when all of the following conditions shall have been satisfied:

(i)    one (1) Business Day shall have passed after written notice of such assignment and delegation (together with payment instructions, addresses and related information with respect to the Assignee) shall have been given to the Borrower; and

(ii)    the assigning Lender and the Assignee shall have executed and delivered an Assignment Agreement and furnished a copy thereof to the Borrower.

From and after the date on which the conditions described above have been met, the Assignee shall be deemed automatically to have become party hereto and shall have the rights and obligations of the Lender hereunder and the assigning Lender shall be released from its obligations hereunder. Accrued interest on the assigned Loans shall be paid as provided in the Assignment Agreement. Within five Business Days after requested to do so, Borrower shall also execute and deliver such UCC and other Collateral assignments as may be requested by Assignee Lender on the assigning Lender.

Section 9.12.  Governing Law. This Agreement and the Loans, and the rights and duties

30

145024696V-1

of the parties hereto and thereto, shall be construed and determined in accordance with the laws of the State of Illinois, without regard to the internal laws thereof with respect to conflicts of law.

Section 9.13.  Headings.  Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

Section 9.14.  Entire Agreement.  This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and any prior or contemporaneous agreements, whether written or oral, with respect thereto are superseded hereby.

Section 9.15.  Terms of Collateral Documents Not Superseded.  Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

Section 9.16.  Construction.  The parties hereto acknowledge and agree that this Agreement shall not be construed more in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation and preparation of this Agreement.

143024MfV-I

APR-09-2007  10:46AM   FROM-                                          T-150   P.037/037   F-730

Upon execution hereof by all the parties, this Agreement shall be a contract among the parties as of the date first above written for the purposes hereinabove set forth.

HOME LOANS USA, INC.

By:

Name: _Renee L. Massey_

Title: _CEO_

Accepted and agreed to as of the day and year first above written.

HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC.

By: _Jane Axton_

Name: _Jane Axton_

Title: _Director_

Credit Agreement Signature Page

## EXHIBIT A

## REVOLVING CREDIT NOTE

_____, _____

FOR VALUE RECEIVED, the undersigned, HOME LOANS USA, INC., a California corporation (the "Borrower"), promises to pay to the order of HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC. (the "Lender") on the Termination Date of the hereinafter defined Credit Agreement, at the principal office of the Lender in Chicago, Illinois, in immediately available funds, the aggregate unpaid principal amount of all Loans made by the Lender to the Borrower under the Revolving Credit pursuant to such Credit Agreement and with each such Loan to mature and become payable as provided in such Credit Agreement, together with interest on the principal amount of each such Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

The Lender shall record on its books or records or on a schedule attached to this Note, each Loan made by it pursuant to its Commitment, together with all payments of principal and interest and the principal balances from time to time outstanding hereon, provided that prior to the transfer of this Note all such amounts shall be recorded on a schedule attached to this Note. The record thereof, whether shown on such books or records or on the schedule to this Note, shall be prima facie evidence of the same, provided, however, that the failure of the Lender to record any of the foregoing or any error in any such record shall not limit or otherwise affect the obligation of the Borrower to repay all Loans made to it under the Revolving Credit pursuant to the Credit Agreement together with accrued interest thereon.

This Note is the Note referred to in the Amended and Restated Credit Agreement dated June 30, 2006 between the Borrower and the Lender (such Credit Agreement as the same may from time to time be amended or restated being referred to as the "Credit Agreement") and payment hereof is secured by the Collateral Documents, and this Note and the holder hereof are entitled to all the benefits provided for thereby or referred to therein, to which Credit Agreement and Collateral Documents reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement.

Prepayments may be made hereon, certain prepayments are required to be made hereon and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement and Collateral Documents.

The Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

HOME LOANS USA, INC.

By:_____
Name:_____
Title:_____

08CV3161
JUDGE MORAN   YM
MAGISTRATE JUDGE KEYS

2

## EXHIBIT B

**States in which the Borrower Is Qualified to
Conduct Business  as of Closing**

California

## EXHIBIT C

## REQUIRED DOCUMENTS

A.    REQUIRED DOCUMENTS

1.    Original mortgage note with MERS Registration (MIN) number and endorsed by the Borrower in blank, unless the original mortgage note is delivered to the Lender directly by the Closing Agent.

2.    A copy of the mortgage or deed of trust securing above mortgage note, together with an assignment(s) to Borrower from the original holder(s), if applicable, which has been certified by the Closing Agent as a true and correct copy of the original sent to the appropriate recording office and displaying the MIN and containing evidence showing MERS as original nominee for mortgagee.

3.    A certified copy of the commitment for a policy of title insurance written by a title company, a title report, or a property report insuring the mortgage or deed of trust as a first or second, as appropriate, lien on the Property and in amount and containing exceptions satisfactory to the Lender.

4.    Original or certified true and correct copy of the applicable final executed HUD-1 statement.

5.    Without waiving any requirement for an Eligible Mortgage Loan under the Credit Agreement, if for any reason the Mortgage Loan is not a MERS Designated Mortgage Loan, Assignment of the mortgage or deed of trust by the Borrower in blank and in recordable form and the original or a duly certified copy of a proper assignment or assignments of the related mortgage or deed of trust from the original holder, through and subsequent transferees to the Borrower duly recorded. The assignment by the Borrower to the Lender shall not be filed for record unless the Lender shall determine in its sole discretion that it is necessary to do so in connection with the perfection of the security interest therein, such recordation to be at the Borrower's expense.

6.    Allonge of the mortgage note by the Borrower executed in blank and the original endorsement or original proper allonge or allonges attached to such mortgage note from the original holder, through and subsequent transferees to the Borrower duly executed.

7.    Other documentation as the Lender may deem appropriate, as well as documentation necessary to fulfill requirements of take-out commitments.

8.    The Borrower will execute at any time such additional documents as may be necessary in the opinion of the Lender to transfer to the Lender for the title to any Collateral pledged and/or hypothecated pursuant to the Security Agreement.

B.    FUNDING PACKAGE

     Documents to be received by Lender by 5:00 p.m. CST the Business Day prior to funding for refinance and second mortgage transactions, or by 1:00 p.m. CST of the current Business Day for purchase transactions:

1.    Submit Funding Request using the Online Funding Request Form located on the HSBC-MS Business to Business (B2B) web site whose address is: https://www.hsbcmortgageb2b.com/ln/lnmb_login.jsp

2.    Copy of the Insured Closing Protection Letter from an approved title insurance underwriter unless original already on file with Lender as in the case of an Approved Closing Agent

3.    Copy of Closing Agent's bank wiring instructions unless already on file with Lender as in the case of an Approved Closing Agent

2

## EXHIBIT C-2

## CLOSING AGENT APPROVAL PACKAGE

We fund all loans directly to approved closing agents; attorneys, title companies, or escrow companies. In order to obtain approval, the following approval package as outlined below must be submitted to us. We maintain a list of approved closing agents on the HSBC-MS Business to Business (B2B) Website whose address is: http://www.hsbcmortgageb2b.com/In/Inmb_login.jsp.

The Closing Agent approval package will include the following information:

- An insured closing protection letter (ICPL) as described below

- If an ICPL cannot be obtained, the declaration page of their E&O Policy which must contain the following:

  - The Title Company, attorney, or escrow company as the insured
  - Professional liability will be the only acceptable type of coverage
  - List a minimum insured amount of $500,000 per claim
  - List a minimum aggregate coverage amount of $1 million
  - Term of policy must exceed 60 days

### *Insured Closing Protection and Approved Title Underwriters*

Adequate closing protection will consist of an insured closing protection letter (ICPL) issued on the letterhead of an approved major title insurance underwriter in acceptable Alta format.

HSBC approved title insurance underwriters can be found on Demotech's free website located at demotech.com, with a financial stability rating of A'', A', A or S.

The ICPL should be addressed as follows:

> HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC., Its Successors and/or Assigns
> Warehouse Lending Division
> 6060 J.A. Jones Drive, Suite 800
> Charlotte, North Carolina 28287

- The ICPL may also be addressed to the name of, the "Originator", "Its Successors and/or Assigns."

### State Exceptions

- Blanket closing protection is not offered for properties located in New Jersey, Pennsylvania, Maryland, Virginia, North Carolina and Nebraska which will require the

submission of a borrower-specific closing protection letter for any loan funded in these states.

- New York closing agents will not be required to execute the insured closing protection letters and will be <u>dry funded only</u> for refinance and second mortgages. The original note must be received prior to disbursement.
- Iowa closings through attorneys will be <u>dry funded only</u> for refinance and second mortgages.
- Washington State closings, where closing protection letters are not available, will be dry funded only.
- Approval of closing agent funding in these states for purchase money mortgages will be dry funded only, on a case-by-case basis.

*Note:*  If multiple closing agents are listed on the Schedule A of the ICPL, each individual closing agent location must obtain approval before funds will be wired.

# EXHIBIT D

## SUBSIDIARIES

None

EXHIBIT E

## HOME LOANS USA, INC.

### BORROWING BASE CERTIFICATE

To:    HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC.

Pursuant to the terms of the Amended and Restated Credit Agreement dated as of June 30, 2006, between us (the "Credit Agreement"), we submit this Borrowing Base Certificate to you and certify that the information set forth below and on any attachments to this Certificate is true, correct and complete as of the date of this Certificate.

A. Borrowing Base(All Category A items to be reported as original principal amount less payments by account debtors exceeding 2% of aggregate principal amount)

| | | | | |
|---|---|---|---|---|
| 1. | | Face Amount of Collateral[1] | | A1 |
| 2. | | Less: | | |
| | (a) | Owed by an account debtor who is an Affiliate, shareholder, or employee | _____ | |
| | (b) | Owed by an account debtor who is in an insolvency or reorganization proceeding | _____ | |
| | (c) | Unpaid more than 30 days | _____ | |
| | (d) | Subject to claims, offsets or defenses | _____ | |
| | (e) | Rewritten or subject to forbearance arrangement | _____ | |
| | (f) | Included in Borrowing Base for more than 45 days | _____ | |
| | (g) | Required documentation not received | _____ | |
| | (h) | Otherwise not an Eligible Mortgage Loan | _____ | |
| | | Sum of Lines A2(a)-A2(h) | | A2 |
| 3. | | Eligible Mortgage Loans (line A1 minus A2) | | A3 |

---

[1]  Including all mortgage loans against which Lender has advanced funds even if mortgage note and other required documents have not yet been pledged

    4.     Borrowing Base (Line A3x100%)[2]         A4

B.  End of Month Line Balance         B

C.  Line A4 minus Line B (if positive, unused
availability against existing collateral, if negative,
prepayment required)         C

Dated as of this _____ day of _____, _____.

                     HOME LOANS USA, INC.

                     By:_____

                     Its:_____

---

[2]    If percentage advance rate has been reduced per Credit Agreement, substitute applicable percentage

14502466\V-1

**EXHIBIT F**

**HOME LOANS USA, INC.**

**COMPLIANCE CERTIFICATE**

To:   HSBC MORTGAGE SERVICES WAREHOUSE LENDING, INC.

This Compliance Certificate is furnished to you pursuant to the requirements of Section 7.5 of that certain Amended and Restated Credit Agreement dated as of June 30, 2006 (the "Credit Agreement"), by and between Home Loans USA, Inc. (the "Borrower") and you (the "Lender"). Unless otherwise defined herein, the terms used in this Compliance Certificate have the meanings ascribed thereto in the Credit Agreement.

The Undersigned hereby certifies that:

1.   I am the duly elected _____ of the Borrower;

2.   I have reviewed the terms of the Credit Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of the Borrower and its Subsidiaries during the accounting period covered by the attached financial statements;

3.   The examinations described in paragraph 2 did not disclose, and I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth below;

4.   The financial statements required pursuant to Section 7.5 of the Credit Agreement and being furnished to you concurrently with this certificate are true, correct and complete as of the dates and for the periods covered thereby; and

5.   The Attachment hereto sets forth financial data and computations evidencing the Borrower's compliance with certain covenants of the Credit Agreement, all of which data and computations are true, correct and complete and have been made in accordance with the relevant Sections of the Credit Agreement.

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which the Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

The foregoing certifications, together with the computations set forth in the Attachment hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____ _____.

_____

_____, _____
(Type or Print Name)  (Title)

ATTACHMENT TO COMPLIANCE CERTIFICATE

HOME LOANS USA, INC.

Compliance Calculations for Credit Agreement

Calculations as of _____, __

A.    Tangible Net Worth (Section 7.14)
1.    Total shareholder's equity                 $_____
                                                         A1

2.    Sum of:
      (i)    intangible assets $_____
      (ii)   write-up of assets $_____     $_____
      (iii)  deferred assets/                            A2
             charges $_____
      (iv)   excluded servicing
             contracts $_____
      (v)    assets due from Affiliates,
             etc. $_____
3.    Line A1 minus Line A2
      (Tangible Net Worth)                       $_____
                                                         A3

4.    Line A3 must be greater than              $600,000
                                                         A4

5.    Borrower in compliance? (circle)          yes/no
B.    Leverage Ratio (Section 7.15)

1.    Total Liabilities                          $_____
                                                         B1

2.    Tangible Net Worth (Line A3 above)        $_____
                                                         B2

3.    Ratio of Line B1 to Line B2               _____:1.00
                                                         B3

4.    Line B3 ratio must not exceed             12.00:1.00
                                                         B4

5.    Borrower in compliance? (circle)          yes/no

C.    Net Income (Section 7.16)

1.    Net Income for three month period         $_____
      ending computation date                            C1

2.    Line C1 amount must be greater than

$____0____
C2

3.    Borrower in compliance? (circle)

yes/no

D.    Indebtedness (Section 7.6)

1.    Indebtedness under other warehousing
      credit facilities

$_____
D1

2.    Line D1 amount must not exceed

$10,000,000
D2

3.    Borrower in compliance? (circle)

yes/no

4.    Purchase money indebtedness

$_____
D4

5.    Capitalized lease obligations

$_____
D5

6.    Sum of Lines D4 and D5

$_____
D6

7.    Line D6 amount must not exceed

$450,000
D7

8.    Borrower in compliance? (circle)

yes/no

EXHIBIT G

PENDING LITIGATION

None.

## EXHIBIT H

## MISSING COLLATERAL AND OTHER FEES

A.  In the event a complete Funding Package and all Required Documents for any Mortgage Loan are not received within seven (7) calendar days of disbursement of the related Loan, a fee will be due and payable on account of such Loan computed in accordance with the following:

| Days Until Receipt | Fee |
|---|---|
| 8-14 | $25 |
| 15-27 | $40 |
| 28-37 | $60 |
| 37+ | $75 plus $10 per day thereafter (fee will be capped at $150) |

Collateral will not be considered complete until the entire Credit Package and all Required Documents have been received by Lender.

B.  In addition, there will be a $50.00 charge for bypassing Lender and sending collateral directly to the Investor.

EXHIBIT I

## AGED LOAN PROCESSING FEES

The following fee will be due and payable for any outstanding Loan that is aged:

| Days Outstanding | Total Aged Loan Processing Fee |
|---|---|
| 61-90 | $175 |
| 91-120 | $225 |
| 121+ | $275 |

08CV3161
JUDGE MORAN   YM
MAGISTRATE JUDGE KEYS

# EXHIBIT B

JUL-25-2007  02:07PM   FROM-                                          T-488   P.002/011   F-254

## CONTINUING GUARANTY

FOR VALUE RECEIVED, and in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to HOME LOANS USA, INC., a California corporation ("Borrower"), by HOUSEHOLD COMMERCIAL FINANCIAL SERVICES, INC. ("Lender"), the undersigned Renee Massey ("Guarantor"), hereby agrees as follows:

1.    Guaranty of Obligations. Guarantor unconditionally, absolutely and irrevocably guarantees the full and prompt payment and performance when due, whether by acceleration or otherwise, and at all times thereafter, of all obligations of Borrower to Lender, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing or due or to become due, including, without limitation, under or in connection with that certain Credit Agreement dated December 8, 2003 as the same may from time to time be amended and currently in effect between Borrower and Lender (the "Credit Agreement") and each of the documents, instruments and agreements executed and delivered in connection therewith, as each may be modified, amended, supplemented or replaced from time to time (all such obligations are herein referred to, collectively, as the "Liabilities", and all documents evidencing or securing any of the Liabilities are herein referred to, collectively, as the "Loan Documents"). This Continuing Guaranty (this "Continuing Guaranty") is a guaranty of payment and performance when due and not of collection.

In the event of any default by Borrower in making payment of, or default by Borrower in performance of, any of the Liabilities, Guarantor agrees on demand by Lender to pay and perform all of the Liabilities as are then or thereafter become due and owing or are to be performed under the terms of the Loan Documents. Guarantor further agrees to pay all expenses (including reasonable attorneys' fees and expenses) paid or incurred by Lender in endeavoring to collect the Liabilities, or any part thereof, and in enforcing this Continuing Guaranty.

2.    Continuing Nature of Guaranty and Liabilities. This Continuing Guaranty shall be continuing and shall not be discharged, impaired or affected by:

a.    the insolvency of Borrower or the payment in full of all of the Liabilities at any time or from time to time;

b.    the power or authority or lack thereof of Borrower to incur the Liabilities;

c.    the validity or invalidity of any of the Loan Documents securing the same;

d.    the existence or non-existence of Borrower as a legal entity;

e.    any transfer by Borrower of all or any part of any collateral in which Lender has been granted a lien or security interest pursuant to the Loan Documents;

f.    any statute of limitations affecting the liability of Guarantor under this Continuing Guaranty or the Loan Documents or the ability of Lender to enforce this Continuing Guaranty or any provision of the Loan Documents; or

143450701V-1

g.    any right of offset, counterclaim or defense of Guarantor, including, without limitation, those which have been waived by Guarantor pursuant to Paragraph 6 hereof.

3.    <u>Insolvency of Borrower or Guarantor</u>. Without limiting the generality of any other provision hereof,  Guarantor agrees that, in the event of the dissolution or insolvency of Borrower or Guarantor or the inability of Borrower or Guarantor to pay their respective debts as they mature, or an assignment by Borrower or Guarantor for the benefit of creditors, or the institution of any proceeding by or against Borrower or Guarantor alleging that Borrower or Guarantor is insolvent or unable to pay their respective debts as they mature, Guarantor will pay to Lender forthwith the full amount which would be payable hereunder by Guarantor if all of the Liabilities were then due and payable, whether or not such event occurs at a time when any of the Liabilities are otherwise due and payable.

4.    <u>Payment of the Liabilities</u>. Any amounts received by Lender from whatever source on account of the Liabilities may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect, and notwithstanding any payments made by or for the account of Guarantor pursuant to this Continuing Guaranty.

Guarantor agrees that, if at any time all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of Borrower), such Liabilities shall, for the purposes of this Continuing Guaranty and to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence notwithstanding such application by Lender, and this Continuing Guaranty shall continue to be effective or be reinstated, as the case may be, as to such Liabilities, all as though such application by Lender had not been made.

5.    <u>Permitted Actions of Lender</u>. Lender may from time to time, in its sole discretion and without notice to Guarantor, take any or all of the following actions:

a.    retain or obtain a security interest in any assets of Borrower or any third party to secure any of the Liabilities or any obligations of Guarantor hereunder;

b.    retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to Guarantor, with respect to any of the Liabilities;

c.    extend or renew for one or more periods (whether or not longer than the original period), alter or exchange any of the Liabilities;

d.    waive, ignore or forbear from taking action or otherwise exercising any of its default rights or remedies with respect to any default by Borrower under the Loan Documents;

e.    release, waive or compromise any obligation of Guarantor hereunder or any obligation of any nature of any other obligor primarily or secondarily obligated with respect to any of the Liabilities;

2

f.     release its security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any collateral now or hereafter securing any of the Liabilities or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, waive, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property; and

g.     demand payment or performance of any of the Liabilities from Guarantor at any time or from time to time, whether or not Lender shall have exercised any of its rights or remedies with respect to any property securing any of the Liabilities or any obligation hereunder, or proceeded against any other obligor primarily or secondarily liable for payment or performance of any of the Liabilities.

6.     Specific Waivers. Without limiting the generality of any other provision of this Continuing Guaranty, Guarantor hereby expressly waives:

a.     notice of the acceptance by Lender of this Continuing Guaranty;

b.     notice of the existence, creation, payment, nonpayment, performance or nonperformance of all or any of the Liabilities;

c.     presentment, demand, notice of dishonor, protest, notice of protest and all other notices whatsoever with respect to the payment or performance of the Liabilities or the amount thereof or any payment or performance by Guarantor hereunder;

d.     all diligence in collection or protection of or realization upon the Liabilities or any thereof, any obligation hereunder or any security for or guaranty of any of the foregoing;

e.     any right to direct or affect the manner or timing of Lender's enforcement of its rights or remedies;

f.     any and all defenses which would otherwise arise upon the occurrence of any event or contingency described in Paragraph 1 hereof or upon the taking of any action by Lender permitted hereunder;

g.     any defense, right of set-off, claim or counterclaim whatsoever and any and all other rights, benefits, protections and other defenses available to Guarantor now or at any time hereafter, including, without limitation, under California Civil Code Sections 2787 to 2855, inclusive, and California Code of Civil Procedure Sections 580a, 580b, 580d or 726, and all successor sections; and

h.     all other principles or provisions of law, if any, that conflict with the terms of this Continuing Guaranty, including, without limitation, the effect of any circumstances that may or might constitute a legal or equitable discharge of a guarantor or surety.

7.     Irrevocability. Guarantor hereby further waives all rights to revoke this Continuing Guaranty at any time, and all rights to revoke any agreement executed by Guarantor at any time to secure the payment and performance of Guarantor's obligations under this Continuing Guaranty.

3

8. **Statutory Waiver of Rights and Defenses Regarding Election of Remedies.** Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

9. **Subordination.** Guarantor hereby (i) subordinates any and all indebtedness of Borrower to Guarantor to the full and prompt payment and performance of all of the Liabilities, and (ii) Guarantor agrees that Lender shall be entitled to receive payment of all Liabilities prior to Guarantor's receipt of payment of any amount of any indebtedness of Borrower to Guarantor. Any payments on such indebtedness to Guarantor (to the extent made in violation of the terms of this Continuing Guaranty), if Lender so requests, shall be collected, enforced and received by Guarantor, in trust, as trustee for Lender and shall be paid over to Lender on account of the Liabilities, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Lender is authorized and empowered, but not obligated, in its discretion, (a) in the name of Guarantor, to collect and enforce, and to submit claims in respect of indebtedness of Borrower to Guarantor and to apply any amounts received thereon to the Liabilities, and (b) to require Guarantor (i) to collect and enforce, and to submit claims in respect of any indebtedness of Borrower to Guarantor, and (ii) to pay any amounts received on such indebtedness to Lender for application to the Liabilities.

10. **Subrogation.** Guarantor will not at any time exercise any rights which it may acquire by way of subrogation under this Continuing Guaranty, by any payment hereunder or otherwise. If any amount shall be paid to Guarantor on account of such subrogation rights at any time, such amount shall be held in trust for the benefit of Lender and shall be forthwith paid to Lender to be credited and applied to the Liabilities, whether matured or unmatured, in such manner as Lender shall determine in its sole discretion.

11. **Assignment of Lender's Rights.** Lender may, from time to time, without notice to Guarantor, assign or transfer any or all of the Liabilities or any interest therein and, notwithstanding any such assignment or transfer of the Liabilities or any subsequent assignment or transfer thereof, the Liabilities shall be and remain the Liabilities for the purpose of this Continuing Guaranty. Each and every immediate and successive assignee or transferee of any of the Liabilities or of any interest therein shall, to the extent of such party's interest in the Liabilities, be entitled to the benefits of this Continuing Guaranty to the same extent as if such assignee or transferee were Lender, provided, however,   that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of any such assignee or transferee, to enforce this Continuing Guaranty for its own benefit as to those of the Liabilities which Lender has not assigned or transferred.

12. **Indulgences Not Waivers.** No delay in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy; nor shall any modification or waiver of any of the provisions of this Continuing Guaranty be binding upon Lender, except as expressly set forth in a writing duty signed and delivered by Lender. No

4

action of Lender permitted hereunder shall in any way affect or impair the rights of Lender or the obligations of Guarantor under this Continuing Guaranty.

13.    Financial Condition of Borrower. Guarantor represents and warrants that it is fully aware of the financial condition of Borrower, and Guarantor delivers this Continuing Guaranty based solely upon its own independent investigation of Borrower's financial condition and in no part upon any representation or statement of Lender with respect thereto. Guarantor further represents and warrants that it is in a position to and hereby does assume full responsibility for obtaining such additional information concerning Borrower's financial condition as Guarantor may deem material to its obligations hereunder, and Guarantor is not relying upon, nor expecting Lender to furnish it any information in Lender's possession concerning Borrower's financial condition or concerning any circumstances bearing on the existence or creation, or the risk of nonpayment or nonperformance of the Liabilities.

Guarantor hereby waives any duty on the part of Lender to disclose to Guarantor any facts it may now or hereafter know about Borrower, regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume, or has reason to believe that such facts are unknown to Guarantor.

Guarantor hereby knowingly accepts the full range of risk encompassed within a contract of "Continuing Guaranty" which includes, without limitation, the possibility that Borrower will contract for additional indebtedness for which Guarantor may be liable hereunder after Borrower's financial condition or ability to pay its lawful debts when they fall due has deteriorated.

14.    Representations and Warranties. Guarantor represents and warrants to Lender that each of the following statements is accurate and complete as of the date of this Continuing Guaranty:

a.    this Continuing Guaranty has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally;

b.    the execution, delivery and performance of this Continuing Guaranty do not (i) violate any provisions of law or any order of any court or other agency of government (each, a "Requirement of Law"), (ii) contravene any provision of any material contract or agreement to which Guarantor is a party or by which Guarantor or Guarantor's assets are bound (each, a "Contractual Obligation"), or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature upon any property, asset or revenue of Guarantor;

c.    all consents, approvals, orders and authorizations of, and registrations, declarations and filings with, any governmental agency or authority or other person or entity (including, without limitation, the shareholders or partners of any entity), if any, which are required to be obtained in connection with the execution and delivery of this Continuing Guaranty or the performance of Guarantor's obligations hereunder have been obtained, and each is in full force and effect;

5

d.     Guarantor has paid all taxes and other charges imposed by any governmental agency or authority due and payable by Guarantor other than those which are being challenged in good faith by appropriate proceedings;

e.     Guarantor is not in violation of any Requirement of Law or Contractual Obligation other than any violation the consequences of which could not have a material adverse effect on Guarantor's ability to perform its obligations hereunder (a "Material Adverse Effect"); and

f.     no action, proceeding, investigation or litigation is pending or, to the knowledge of Grantor, overtly threatened against Guarantor by any person or entity which, if adversely determined, could have a Material Adverse Effect.

15.     Guarantor Financial Information. Guarantor will provide Lender in writing such financial and other information with respect to Guarantor's assets and liabilities as Lender shall reasonably request from time to time, in form satisfactory to Lender.

16.     Binding Upon Successors. This Continuing Guaranty shall be binding upon Guarantor and Guarantor's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. This Continuing Guaranty shall not terminate or be revoked upon the death of Guarantor, notwithstanding any knowledge by Lender of Guarantor's death.

All references herein to Borrower shall be deemed to include its successors and assigns, and all references herein to Guarantor shall be deemed to include Guarantor and Guarantor's successors and assigns or, upon the death of Guarantor, the duly appointed representative, executor or administrator of Guarantor's estate.

In addition and notwithstanding anything to the contrary contained in this Continuing Guaranty or in any other document, instrument or agreement between or among any of Lender, Borrower, Guarantor or any third party, the obligations of Guarantor with respect to the Liabilities shall be joint and several with any other person or entity that now or hereafter executes a guaranty of any of the Liabilities separate from this Continuing Guaranty.

17.     Notices. All notices required or permitted to be given hereunder shall be in writing and shall be either personally delivered, transmitted by facsimile to the facsimile numbers provided herein or sent by United States certified or registered mail, return receipt requested, addressed to Guarantor or Lender at their respective addresses stated below or at such other address as either party hereafter notifies the other party as herein provided. Notices shall be deemed received on the earlier of (i) the date noted on the return receipt as delivered if mail delivery of the notice is successful or the date inscribed on a confirmation of successful transmission, if sent by facsimile; (ii) the last date of attempted delivery, as noted by the United States Postal Service on the envelope containing the notice, if mail delivery is unsuccessful; or (iii) the date of the actual delivery if personally delivered.

18.     Governing Law: Additional Waivers. This Continuing Guaranty has been delivered and shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of Illinois, provided that Guarantor agrees

that each of the waivers and agreements of Guarantor herein which refer to provisions of the California Civil Code and the California Code of Civil Procedure shall be effective and enforceable to the extent permitted under applicable law, and to the extent that any court of competent jurisdiction shall apply the laws of the State of California to determine the relative rights or remedies of Lender and Guarantor hereunder, such waivers and agreements by Guarantor shall be governed by the laws of the State of California.

GUARANTOR HEREBY

(i)     WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION TO ENFORCE OR DEFEND ANY MATTER ARISING FROM OR RELATED TO THIS CONTINUING GUARANTY, AND ACKNOWLEDGES THAT LENDER ALSO WAIVES SUCH RIGHT;

(ii)    IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN COOK COUNTY, ILLINOIS, OVER ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY MATTER ARISING FROM OR RELATED TO THIS CONTINUING GUARANTY;

(iii)   IRREVOCABLY WAIVES, TO THE FULLEST EXTENT GUARANTOR MAY ACTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY SUCH ACTION OR PROCEEDING;

(iv)    agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by law; and

(v)     agrees not to institute any legal action or proceeding against  Lender or any of Lenders directors, officers, employees, agents or property concerning any matter out of or relating to this Continuing Guaranty in any court other than one located in Cook County, Illinois.

Nothing herein shall affect or impair Lender's right to serve legal process in any manner permitted by law or Lender's right to bring any action or proceeding against Guarantor or its property in the courts of any other jurisdiction. Wherever possible each provision of this Continuing Guaranty shall be interpreted as to be effective and valid under applicable law, but if any provision of this Continuing Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Continuing Guaranty.

19.     ADVICE OF COUNSEL. GUARANTOR ACKNOWLEDGES THAT IT HAS EITHER OBTAINED THE ADVICE OF COUNSEL OR HAS HAD THE OPPORTUNITY TO OBTAIN SUCH ADVICE IN CONNECTION WITH THE TERMS AND PROVISIONS OF THIS CONTINUING GUARANTY.

20.     Entire Agreement. This Continuing Guaranty contains the complete understanding of the parties hereto with respect to the subject matter herein. Guarantor acknowledges that it is not relying upon any statements or representations of Lender not

7

contained in this Continuing Guaranty and that such statements or representations, if any, are of no force or effect and are fully superseded by this Continuing Guaranty. This Continuing Guaranty may only be modified by a writing executed by Guarantor and Lender.

IN WITNESS WHEREOF, Guarantor has caused this Continuing Guaranty to be duly executed this 8th day of December, 2003.

Guarantor

RENEE MASSEY

Guarantor's address for notices:
c/o Home Loans USA, Inc.
7536 East Chapman Avenue
Orange, California 92869
Facsimile: 714-538-7416

Lender's address for notices:
c/o Household Commercial Financial Services, Inc.
1301 East Tower Road
Schaumburg, IL 60173
Attention: Robert Carse
Facsimile: 847-843-4320

JUL-25-2007  02:11PM  FROM-                                    T-488  P.010/011  F-254

## CONSENT AND REAFFIRMATION

The undersigned, Renee L. Massey (the "Guarantor") has heretofore executed and delivered to Household Commercial Financial Services, Inc. (the "Original Lender"), a Guaranty in favor of the Original Lender dated as of December 8, 2003 (the "Guaranty"), the Original Lender having assigned all of its rights therein to HSBC Mortgage Services Warehouse Lending Inc. (the "Lender"):

The Guaranty was executed and delivered in connection with that certain Credit Agreement dated as of December 8, 2003 as heretofore amended from time to time (the "Existing Credit Agreement") between HOME LOANS USA, INC., a California corporation (the "Borrower") and the Lender.

The Borrower has requested the Lender to make certain amendments to the Existing Credit Agreement all as set forth in that certain Amended and Restated Credit Agreement dated as of even date herewith between Borrower and Lender (the "Amended and Restated Credit Agreement"), a true and correct copy of which has been furnished to the Guarantor.

In order to induce the Lender to enter into the Amended and Restated Credit Agreement, the Guarantor hereby agrees with the Lender as follows:

1.      The Guarantor hereby consents to the Amended and Restated Credit Agreement and confirm that all of Guarantor's agreements and obligations under the Guaranty executed by such Guarantor remain in full force and effect and, without limiting the foregoing, acknowledges and agrees that all obligations of the Borrower under or in connection with the Amended and Restated Credit Agreement constitute Liabilities which are guaranteed by the Guaranty for the benefit of the Lender.

2.      The Guarantor hereby agrees that Guarantor's consent to any further amendments to the Amended and Restated Credit Agreement shall not be required as a result of this consent having been obtained.

This Consent may be executed in any number of counterparts, and by different parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement. This Consent shall be governed by the internal laws of the State of Illinois.

145024540V-1

Dated as of June 30, 2006

_____
Renee L. Massey

Accepted and agreed to as of the date and year last above written.

HSBC MORTGAGE SERVICES
WAREHOUSE LENDING, INC.

By: _____
Name: _____
Its: _____

- 2 -

14 5024541V-1

08CV3161
JUDGE MORAN   YM
MAGISTRATE JUDGE KEYS

# EXHIBIT C



MICHAEL L. MOLINARO
Partner

321 North Clark Street          Direct  312.464.3166
Suite 2300                      Main   312.464.3100
Chicago, IL 60610-4746          Fax    312.896.5592
                                mmolinaro@loeb.com

Via Telecopy

April 5, 2007

Home Loans USA, Inc.
7536 East Chapman Avenue
Orange, CA 92869
Attn: Renee L. Massey

Renee L. Massey, as Guarantor
c/o Home Loans USA, Inc.
7536 East Chapman Avenue
Orange, CA 92869

Re:    Amended and Restated Credit Agreement dated as of June 30, 2006 (the "Credit
       Agreement") by and between Home Loans USA, Inc. ("Borrower") and HSBC Mortgage
       Services Warehouse Lending, Inc. ("Lender")

Dear Ms. Massey:

This firm represents the Lender in connection with the above-referenced Credit Agreement, and
this letter is written to you on the Lender's behalf and at its direction. All capitalized terms used
but not otherwise defined herein shall have the respective meanings ascribed to such terms in
the Credit Agreement.

This letter shall constitute notice to the Borrower and Guarantor that Borrower has defaulted
under the terms of the Credit Agreement. Borrower has committed an Event of Default under
the Credit Agreement by failing to comply with the requirement to provide financial statements to
Lender as set forth in Section 7.5 of the Credit Agreement ("Covenant Default"). Due to the
Covenant Default, Lender hereby terminates the Commitment, provided that the Commitment
shall be reinstated (except as set forth below) at the time Borrower cures the Covenant Default.
Consequently, Lender shall not extend any credit or make any advances to Borrower until the
Covenant Default is cured.

In addition, Borrower has committed an Event of Default by having the outstanding principal
balance of the Loans exceed the Borrowing Base by $344,875 as of April 2, 2007 (the
"Overadvance") and by failing to pay the portion of the Loans constituting the Overadvance (the
"Payment Default"). Lender hereby demands that Borrower cure the Payment Default on or
before May 5, 2007. If Borrower fails to cure the Payment Default on or before May 5, 2007,
Lender may proceed to exercise and enforce all of its rights and remedies available under the
Loan Documents and applicable law, including without limitation, accelerating all indebtedness
under the Loan Documents, foreclosing on the Collateral and proceeding to enforce its rights
and remedies against the Guarantor.

Moreover, as you know, pursuant to Section 2.7(b) of the Credit Agreement, Lender has the
right to terminate its Commitment upon 30 days written notice to Borrower. If Borrower cures

A limited liability partnership including professional corporations

the covenant Default, Lender hereby notifies Borrower and Guarantor that Lender is terminating its Commitment to provide further credit to the Borrower under the Credit Agreement effective on May 5, 2007. Consequently, if Borrower cures the Covenant Default, Lender shall not extend any credit or make any advances to Borrower after May 5, 2007.

Please be advised that it is important that all of Lender's Collateral or the proceeds therefrom be maximized and preserved. In the event that Borrower receives or obtains any proceeds from any of Lender's Collateral, Borrower shall hold such proceeds in trust, in a segregated account, for Lender and shall transfer such proceeds to Lender forthwith.

After the date hereof, the amounts due to Lender from Borrower are subject to confirmation and adjustment by Lender, which may be verified by contacting the undersigned. This letter and any future discussions between Lender and Borrower and/or Guarantor (if any) shall not (i) cause a modification of the Credit Agreement or any of the Loan Documents, (ii) establish a custom or course of dealing, (iii) cure, release or postpone any existing or future default under the Loan Documents or any of the instruments, agreements or documents related thereto, or (iv) waive, limit or condition any of Lender's rights and remedies against Borrower or any other person or entity, all of which rights and remedies are expressly reserved.

If you have any questions regarding this matter, please have your attorney contact me.

Very truly yours,

Michael L. Molinaro
Partner

:jlw
20983510012
CH33388.1

cc:     Ms. Mary Alice Warren
        Mr. Bill G. Moulton
        Judd A. Levy, Esq.



MICHAEL L. MOLINARO
Partner

321 North Clark Street
Suite 2300
Chicago, IL 60610-4746

Direct  312.464.3166
Main    312.464.3100
Fax     312.896.5592
mmolinaro@loeb.com

Via Telecopy

May 16, 2007

Home Loans USA, Inc.
7536 East Chapman Avenue
Orange, CA 92869
Attn:  Renee L. Massey

Renee L. Massey, as Guarantor
c/o Home Loans USA, Inc.
7536 East Chapman Avenue
Orange, CA 92869

Re:  Amended and Restated Credit Agreement dated as of June 30, 2006 (the "Credit
Agreement") by and between Home Loans USA, Inc. ("Borrower") and HSBC Mortgage
Services Warehouse Lending, Inc. ("Lender")

Dear Ms. Massey:

This firm represents the Lender in connection with the above-referenced Credit Agreement, and
this letter is written to you on the Lender's behalf and at its direction.  All capitalized terms used
but not otherwise defined herein shall have the respective meanings ascribed to such terms in
the Credit Agreement.

As you know, pursuant to letter dated April 5, 2007, Lender notified Borrower and Guarantor
that Borrower defaulted under the terms of the Credit Agreement due to, among other things,
the outstanding principal balance of the Loans exceeding the Borrowing Base by $344,875 as of
April 2, 2007 (the "Overadvance") and Borrower's failure to pay the portion of the Loans
constituting the Overadvance.  Lender demanded that Borrower cure this default by May 5,
2007.  Please be advised that Borrower failed to cure this default or otherwise satisfy the
Overadvance in full by May 5, 2007.  In addition, as of May 15, 2007, the amount of the
Overadvance has increased to $432,175.

Please be advised that Lender hereby extends the deadline to pay the Overadvance in full and
cure this default to May 31, 2007.  If Borrower fails to pay the Overadvance in full and cure this
default on or before May 31, 2007, Lender may proceed to exercise and enforce all of its rights
and remedies available under the Loan Documents and applicable law, including without
limitation, accelerating all indebtedness under the Loan Documents, foreclosing on the
Collateral and commencing legal action against the Guarantor to collect all amounts owing by
Borrower to Lender.

In addition, in its letter dated April 5, 2007, Lender terminated the Commitment due to
Borrower's failure to provide to Lender the March 2007 monthly financial statements for
Borrower as required by Section 7.5 of the Credit Agreement.  Borrower has failed to cure this
default or respond to numerous inquires by Lender.  Consequently, Lender hereby demands



Home Loans USA, Inc.
Renee L. Massey, as Guarantor
May 16, 2007
Page 2

that Borrower provide its monthly financial statements for March and April 2007 to Lender by May 31, 2007.

Please be advised that it is important that all of Lender's Collateral or the proceeds therefrom be maximized and preserved. In the event that Borrower receives or obtains any proceeds from any of Lender's Collateral, Borrower shall hold such proceeds in trust, in a segregated account, for Lender and shall transfer such proceeds to Lender forthwith.

After the date hereof, the amounts due to Lender from Borrower are subject to confirmation and adjustment by Lender, which may be verified by contacting the undersigned. This letter and any future discussions between Lender and Borrower and/or Guarantor (if any) shall not (i) cause a modification of the Credit Agreement or any of the Loan Documents, (ii) establish a custom or course of dealing, (iii) cure, release or postpone any existing or future default under the Loan Documents or any of the instruments, agreements or documents related thereto, or (iv) waive, limit or condition any of Lender's rights and remedies against Borrower or any other person or entity, all of which rights and remedies are expressly reserved.

If you have any questions regarding this matter, please have your attorney contact me.

Very truly yours,

Michael L. Molinaro
Partner

MLMMLM:jlw
20983510012
CH34031.1

cc:     Ms. Mary Alice Warren
        Mr. Bill G. Moulton
        Judd A. Levy, Esq.

08CV3161
JUDGE MORAN   YM
MAGISTRATE JUDGE KEYS

# EXHIBIT D



MICHAEL L. MOLINARO
Partner

321 North Clark Street
Suite 2300
Chicago, IL 60610

Direct   312.464.3166
Main    312.464.3100
Fax     312.896.5592
mmolinaro@loeb.com

Via Telecopy and First class mail

August 20, 2007

Home Loans USA, Inc.                          Renee L. Massey, as Guarantor
7536 East Chapman Avenue                       c/o Home Loans USA, Inc.
Orange, CA 92869                               7536 East Chapman Avenue
Attn: Renee L. Massey                          Orange, CA 92869

Re:  Amended and Restated Credit Agreement dated as of June 30, 2006 (the "Credit
     Agreement") by and between Home Loans USA, Inc. ("Borrower") and HSBC Mortgage
     Services Warehouse Lending, Inc. ("Lender")

Dear Ms. Massey:

I am legal counsel for the Lender in connection with the above-referenced Credit Agreement,
and this letter is written to you on the Lender's behalf and at its direction. All capitalized terms
used but not otherwise defined herein shall have the respective meanings ascribed to such
terms in the Credit Agreement.

Lender has made loans (collectively referred to as the "Loans") to Borrower pursuant to the
Credit Agreement and the "Loan Documents" (as said term is defined in the Credit Agreement).
The Loans and all of Borrower's other obligations and liabilities to Lender are secured by,
among other things, that certain Security Agreement dated December 8, 2003, as amended (the
"Security Agreement") and that certain Continuing Guaranty dated December 8, 2003
("Guaranty") executed and delivered by Renee L. Massey ("Guarantor") in favor of Lender.
Under the Guaranty, Guarantor absolutely, unconditionally and irrevocably guarantied to Lender
the full and prompt payment of the Loans and all other obligations and liabilities of Borrower to
Lender.

As you know, pursuant to letters dated April 5, 2007 and May 16, 2007, Lender notified
Borrower and Guarantor that Borrower defaulted under the terms of the Credit Agreement.
Lender demanded that Borrower cure these defaults by May 31, 2007. Borrower, however,
failed to cure these defaults. In addition, pursuant to Section 2.1(b) of the Credit Agreement,
the Loans and all of Borrower's other obligations and liabilities to Lender (the "Indebtedness")
matured on July 31, 2007 and were due and payable in full.

Please be advised that as of August 20, 2007, the Indebtedness totals $433,386.73 for principal
and accrued interest through May 31, 2007. The Indebtedness will continue to increase due to
the accrual of interest at the default rate and for other costs, fees and expenses incurred by
Lender, including without limitation attorneys' fees and expenses. Lender hereby demands that
Borrower and Guarantor pay in full the outstanding balance of the Indebtedness to Lender on or
before August 24, 2007. If the outstanding balance of the Indebtedness is not paid in full to
Lender on or before August 24, 2007, Lender shall proceed to exercise and enforce all of its



Home Loans USA, Inc.
Renee L. Massey, as Guarantor
August 20, 2007
Page 2

rights and remedies available under the Loan Documents and applicable law against Borrower and Guarantor.

Partial payments received by Lender, if any, may at Lender's option be applied to the Indebtedness. However, such partial payments shall not constitute, or be deemed to be, a cure of Borrower's defaults or waive, limit, or condition any of Lender's rights or remedies. This letter and any future discussions between Lender and Borrower and/or Guarantor shall not (i) cause a modification of the Credit Agreement or any of the Loan Documents, (ii) establish a custom or course of dealing, (iii) cure, release or postpone any existing or future default under the Loan Documents or any of the instruments, agreements or documents related thereto, or (iv) waive, limit or condition any of Lender's rights and remedies against Borrower, Guarantor or any other person or entity, all of which rights and remedies are expressly reserved.

If you have any questions regarding this matter, please have your attorney contact me.

Very truly yours,

*Michael L. Molinaro*

Michael L. Molinaro
Partner

cc:    Mr. Chris M. Olliff
        Mr. Bill G. Moulton
        Judd A. Levy, Esq.

CH36153.1
209835-10012